**NATIONAL LABOR RELATIONS BOARD
v. BANK OF AMERICA NAT. TRUST
& SAVINGS ASS'N.**

Nos. 9784, 9785.

Circuit Court of Appeals, Ninth Circuit.

Sept. 14, 1942.

Rehearing Denied Dec. 17, 1942.

Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Gerhard P. Van Arkel, Asst. Gen. Counsel, and Frank Donner, Atty., N. L. R. B., all of Washington, D. C., Richard A. Perkins, Regional Atty., N. L. R. B., of San Francisco, Cal., for petitioner.

Louis Ferrari and G. D. Schilling, both of San Francisco, Cal., and Edmund Nelson, of Los Angeles, Cal., for respondent.

Before WILBUR, STEPHENS, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

These cases are here on petitions of the National Labor Relations Board for the enforcement of orders issued pursuant to § 10(c) of the National Labor Relations Act, 29 U.S.C.A. § 160(c). In case No. 9784 the Board found that the respondent violated § 8(1) and (3) of the Act, 29 U.S.C.A. § 158(1, 3) by the discriminatory discharge of an employee, and in No. 9785 that it violated the same provisions by the discharge of a group of employees and by certain other inhibited conduct.

Respondent is a national banking association having its main office in San Francisco and transacting business at 493 branches in 307 California communities and at a branch in London. In the proceedings before the Board it interposed two jurisdictional defenses, the first of which is that it is not engaged in commerce within the meaning of § 2(6)[1] and that its operations do not affect commerce within the intendment of § 2(7)[2] of the Act. The second defense is that respondent is not an "employer," as that term is defined in the statute.

1. The Board found against respondent on the jurisdictional issue. Its findings in this respect proceed upon uncontroverted evidence.

Respondent is one of the ten largest banks in the world and one of the five largest in this country. At the end of 1937 its total resources amounted substantially to a billion and a half dollars, and its capital, surplus, and undivided profits to over 109 million dollars. It had on deposit with banks in New York, Chicago, and other cities almost 80 million dollars, and had outstanding liabilities of almost 24 million dollars for letters of credit and acceptances and foreign bills on which it was the acceptor, endorser, or maker. It had commercial deposits of over 565 million dollars and loans and discounts outstanding of over 630 million dollars.

In addition to conducting a general commercial banking business respondent offers trust services, small loans, foreign banking, savings banking, and safety deposit boxes. Like any commercial bank, it trans-

---

[1] "The term 'commerce' means trade, traffic, commerce, transportation, or communication among the several States," etc. 29 U.S.C.A. § 152(6).

[2] "The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce." 29 U.S.C.A. § 152(7).

mits funds for its customers from one part of the country to another by the drawing of drafts upon its correspondent banks. It has such correspondents in at least 34 states of the Union and in one territory. It finances the current business operations of its customers, whether they are engaged in agriculture, industry, or commerce, beginning with the production and proceeding through the distribution and marketing of their products. It issues letters of credit and bank drafts, secured by bills of lading or warehouse receipts—standard instruments for the facilitation of domestic and foreign commerce. It trades in foreign exchange. It supplies the capital requirements of every type of industrial and commercial enterprise both through supporting the underwriting and distribution of securities by investment bankers and by maintaining a market for commercial paper. It facilitates the sale and shipment of goods in the channels of commerce through the discounting of trade acceptances; and through a checking system it provides for its customers a means of payment for goods and services which eliminates the necessity and delay of the actual shipment of currency from one part of the country to another. Through its correspondent banks and the Federal Reserve System it participates in a worldwide collection and check clearance system which facilitates commercial transactions. It furnishes fiduciary services, supplies credit information to other banks, acts as fiscal agent for others, handles the transfer and registration of corporate stocks, etc.

■ The nature and extent of the facilities afforded by a banking institution of the size and spread of respondent are too well known to warrant further exploration of the findings. That respondent's activities lend vital support to the commercial life of the nation is of course beyond debate. The impact upon commerce of the partial or complete cessation of its banking operations would be felt immediately throughout the country, and indeed the world. Shipments of merchandise and manufactured wares covered by bills drawn for the acceptance of respondent would be halted; and similar results would follow upon a cessation of

its other credit activities. It is immaterial that substitute service might be obtained elsewhere, National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U.S. 318, 326, 60 S.Ct. 918, 84 L.Ed. 1226. The dependence of commerce upon the continuity of credit furnished by these great banking institutions is as marked as was its dependence upon the electric energy furnished by the intrastate utilities involved in Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126. While credit services, considered as aids to commerce, may be less tangible than is electric current, for present purposes the differences would appear to be immaterial.

■ But apart from the undeniable effect of respondent's operations upon commerce among the states and with foreign nations, it is itself directly and every hour of the business day engaged in interstate activities not describable otherwise than as commerce. To mention but a few of many examples, it sends to banks elsewhere notes, bills, coupons, and drafts for collection, a very large percentage of which latter are drafts covering bill-of-lading shipments of commodities to points outside of California or to foreign countries. It makes telegraphic transfers of money in huge sums to places in other states. And it receives like transfers of money from banks outside the borders of California. Like the news association held to be within the reach of the Act in Associated Press v. N. L. R. B., 301 U.S. 103, 128, 129, 57 S.Ct. 650, 81 L.Ed. 953, respondent's operations "involve the constant use of channels of interstate and foreign communication." These activities "amount to commercial intercourse and such intercourse is commerce within the meaning of the Constitution," Associated Press v. N. L. R. B., supra, 301 U.S. at page 128, 57 S.Ct. at page 654, 81 L.Ed. 953. And see Electric Bond & Share Co. v. Securities and Exchange Commission, 303 U.S. 419, 432, 433, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105; Gibbons v. Ogden, 9 Wheat. 1, 189, 229, 230, 6 L. Ed. 23.[3]

2. We turn briefly to the argument that respondent is an instrumentalilty of the United States, hence is not an employer as

---

[3] The general authorities bearing on the question whether banking transactions may involve interstate commerce are collected in the opinion of Judge St. Sure in Lorenzetti v. American Trust Co., D.C., 45 F.Supp. 128. In the interest of brevity we refer the student of the subject to the cases there collated.

defined in the Act. Section 2(2) provides that the term "employer" shall not include "the United States, or any State or political subdivision thereof * * *." On this point it seems enough to observe that respondent is not within the terms of the exclusion. It is a privately owned corporation, privately managed and operated in the interest of its stockholders. United States Shipping Board Emergency Fleet Corporation v. Western Union Telegraph Co., 275 U.S. 415, 416, 425, 48 S.Ct. 198, 72 L.Ed. 345. The United States did not create it, but has merely enabled it to be created.[4] True, national banks are subject to strict regulation and supervision, but so are a host of other private enterprises. It is true, also, that national banks may at times be called upon as aids in carrying out the fiscal policies of the government, but their activities in these respects are occasional and incidental to the primary purpose of the individuals who organize them.

3. On the merits the cases require the granting of enforcement orders. The record shows that in the spring of 1937 and during the ensuing year the American Federation of Labor and the C. I. O. were active in San Francisco in attempts to organize white-collar workers. Employees of respondent were represented among those who became affiliated with one or the other of these organizations. High officials of respondent knew of the membership campaign and "viewed with uneasiness and hostility the attempt to organize its employees." There is uncontradicted evidence of statements made by one or more of such officials reflecting the attitude described in the findings. It appears further that the bank's counsel, who was also a vice president, officially expressed the view that the bank is not amenable to the National Labor Relations law. Putting the sentiment and the legal opinion together, it is not to be wondered at if employees who participated in or fostered movements for self-organization found themselves in the more or less open displeasure of the bank.

Case No. 9784 has to do with the discharge of an employee named Washer. Washer had been employed in March 1935 to work in respondent's trust department at Los Angeles. Less than a year later he was transferred to the chief clerk's division in the same department. His monthly salary at the commencement was $125, but he received two increases and was being paid $165 by the end of his second year of service. He appears to have been an experienced man, well educated and qualified in the work. In the spring of 1937 he actively interested himself in the unionization of bank clerks. There is evidence to support the finding that this interest became known to respondent. Following the decisions of the Supreme Court holding the National Labor Relations Act valid, Washer placed on a bulletin board in the trust department a newspaper clipping concerning these decisions on which he had written "Read and Think." The posted clipping was noticed by a number of employees and discussed by them with Washer. Later in the same month, after preliminary essays to send him to various other places, Washer was transferred to Chico, a small community in Northern California. He expressed distaste at the assignment, but received the impression that the transfer would be temporary. At Chico he found that the trust business was being fully taken care of by others, and the work given him there was substantially that of a bookkeeper. Without further going into the matter, it is enough to say that Washer's transfer to Chico was inferably a disciplinary measure induced by his interest in unionization.

Dissatisfied with his position at Chico, Washer wrote early in the fall of 1937 to Kieferdorf, the senior trust officer of respondent at San Francisco, with whom he appears to have been personally acquainted. In response Kieferdorf asked him to come to San Francisco for a conference on November 10, at which time Kieferdorf suggested that Washer resign, a suggestion which the latter declined to follow. On Kieferdorf's instructions Washer returned to Chico. On November 24, with a group of other employees of the respondent, he mailed circulars to approximately 5,000 of respondent's employees urging them to unionize. The circulars were signed "Bank of America

---

[4] Whether governmentally created corporations like the Reconstruction Finance Corporation, the Tennessee Valley Authority, the Home Owners Loan Corporation, the Federal Deposit Insurance Corporation, the Federal Intermediate Credit Banks, and like strictly governmental agencies, are employers within the definition of the Act we think it unnecessary to consider.

Employees' Organization Committee." Washer's name was not mentioned in the circular, but his employment record was recited in it so fully that his connection with the matter could not but be noted.

■ November 25th was a holiday. On the morning of the 27th, on instructions from San Francisco, Washer was discharged. Respondent later informed him that he had been discharged "for insubordination and conduct unbecoming a subordinate to a superior officer." Added reasons were assigned by respondent in the present proceeding, (1) that he had given unsatisfactory service, and (2) that he had filed a false expense claim growing out of his November trip from Chico to San Francisco and return. There is no evidence to support the claim of unsatisfactory service. The charge of presenting a false expense voucher is likewise without substantial basis in fact. The claim for travel expense and for two days' subsistence amounted to $15.12. It was ultimately paid by the bank after a full explanation of the circumstances. On the charge of insubordination, the Board found that it, too, was unsupportable; and we are not able to say that the finding is unwarranted. Letters of Washer on which in the main the charge is predicated appear to have been confidential and were written to officials with whom Washer was on familiar if not friendly terms. On the whole record the Board was entitled to infer that Washer was discharged because of his distribution of the circulars.

The Board found that by discriminating in regard to Washer's hire and tenure of employment the respondent engaged in unfair labor practices within the meaning of § 8(3) and (1) of the Act. It entered an order to cease and desist, directed respondent to offer to Washer immediate and full reinstatement with back pay, and to post the usual notices.

■ Case No. 9785. During the summer or early fall of 1937, some fifteen bookkeepers of a San Francisco branch of respondent signed application cards for membership in a local union affiliated with the American Federation of Labor, and made partial payment on dues. Afterwards they talked the matter over with Schacht, the chief clerk in their department, following which discussion letters of withdrawal were typed in the bank, signed by nine of the bookkeepers and mailed in a batch to the local. It appears that all of the bookkeepers shown to have heard Schacht's talk resigned from the union. The Board interpreted Schacht's meeting with the bookkeepers, and the tenor of his advice relating directly to their chances of promotion, as "subtle but effective coercion." While the evidence of coercion on Schacht's part appears to us to be weak, we are not able to say that the Board's finding is unsupported. The incident does not stand alone. In evaluating its significance the Board was entitled to take into account the attitude of unfriendliness to unions manifested in more authoritative quarters.

The main controversy in this case relates to the discharge of a group of ten messengers. These employees constituted the bulk of the personnel of what was known as the automotive messenger department of the respondent in the San Francisco area. The function of this department was to service respondent's immediate branches with supplies and to transmit between the branches and from the branches to the central clearing house customers' checks and other records. For a great many years this service had been performed by an independent contractor, but in 1931 respondent discontinued the contract and brought the automotive messenger service under its direct control. Kerins, the former contractor, was employed as manager and his drivers were placed on respondent's payroll. New messengers were thereafter employed as needed through respondent's personnel department.

The incidents leading up to the severance of this group from the bank's service we now summarize from the findings. The evidence is to some extent conflicting, but there is ample testimony to support the recital. Sometime in August 1937, while the messengers were at lunch, organizers from C. I. O. Local 34 appeared at the bank's Montgomery Street garage. Campana, the respondent's branch manager there, came out with Kerins and told the organizers that while he could not interfere with their soliciting the employees they must keep off the bank property. As the organizers moved away, Campana remarked to Kerins, "they are trouble makers." About August 20 the organizers again came to the garage at the lunch hour and at this time most of the messengers present signed up. One of the messengers,

upon being questioned by Kerins, told him that they had all signed. On the morning of September 3, Campana informed the automotive messengers that the respondent had abolished their department; and he then held separate interviews with several of the messengers, asking each of them whether he had signed anything or joined any organizations. One messenger, Kovacich, who had applied for membership, denied having done so, and was told by Campana not to lie because he had the names of all who had joined. Kovacich was then discharged. On September 7, respondent discharged eight of the other messengers, and still later discharged the tenth upon his reporting for duty. Two members of the messenger department, who had not joined the union, were retained in the bank's employ. One of these had been with the bank on a temporary basis only, whereas a number of the discharged messengers had been with respondent for years.

■ The respondent contends that the automotive messenger service was changed and a contract system installed in its stead solely in the interest of efficiency. However, the Board points out in its findings that the abolition of the department was not made in response to any immediate change of circumstances calling for abrupt adjustment. It was effected suddenly and the department abolished at a day's notice, after six years' experience, before detailed plans for the new service had been worked out. Plummer, an assistant personnel director, did not know the change was being contemplated. Dana, another assistant personnel director, who ordered the change, was uncertain as to whether the decision was made one or five weeks before it was effected. The department manager, Kerins, learned of the change the day before it was made.

The finding of the Board is that the automotive messengers were discharged by respondent in order to rid itself of an undesired nucleus of union members and sympathizers. While there is a considerable showing to the contrary, the finding has ample support in the record.

In addition to a cease and desist order, respondent was ordered to offer to the ten discharged messengers immediate and full reinstatement and to make them whole for loss of pay suffered; also to post the usual notices.

■ 4. Respondent complains of the action of the trial examiner in refusing to require the production of certain written statements said to be in possession of the Board, and in denying respondent's offer of proof in that connection. It claims that in these respects there was a denial of due process. We are unable to agree. Respondent was given full opportunity to make its defense. The evidence in question does not appear to be germane to the matter under inquiry, which was whether respondent was or was not guilty of the unfair labor practices charged against it.

The order in both cases contained the requirement that respondent pay over to the appropriate governmental fiscal agencies any relief moneys received from such agencies by the employees affected. In its petitions for enforcement the Board consents that the orders be modified by striking therefrom the following language: "and pay over the amount, so deducted, to the appropriate fiscal agency of the Federal, State, county, or other government or governments which supplied the funds for said work-relief projects."

Decrees enforcing the orders in cases No. 9784 and No. 9785, as so modified, will be entered forthwith.