In the Matter of New York State Labor Relations Board, Petitioner, against Charman Service Corporation, Respondent.

Supreme Court, Special Term, New York County, July 13, 1951.

*William E. Grady, Jr., Philip Feldblum* and *Richard J. Horrigan* for petitioner.

*David L. Benetar, H. H. Nordlinger, Robert C. Isaacs* and *Henry G. Friedlander* for respondent.

HECHT, J. Petitioner State Labor Relations Board moves for enforcement of its order directing respondent Charman, a New York City taxicab company, to offer reinstatement to one Florio, a taxicab driver, and to pay him the sum of $1,473.78, representing his net loss of earnings.

Respondent, a New York corporation, operates ten taxicabs, employs about thirty drivers, and does a gross annual business of approximately $175,000. In August, 1948, Florio joined Local 35 of the United Mine Workers, which in March, 1949, requested a collective bargaining conference with respondent. Upon the latter's refusal, respondent's employees (including Florio) went on strike. After the strike was over, respondent refused to reinstate Florio.

Florio thereupon filed a complaint of unfair labor practice before the State board. Up to that time the National Labor Relations Board had expressly disclaimed jurisdiction over the operations of taxicab companies which did not cross State lines. The State board held a preliminary hearing on jurisdiction, at the conclusion of which it overruled respondent's contention that the national board had exclusive jurisdiction. It then held a complete hearing on the merits, which resulted in the issuance on October 26, 1950, of the order involved herein. Subsequent to the issuance of the order, the national board reversed its original position, and asserted that it had jurisdiction over a local New York City taxicab company. (*Matter of Skyview Transp. Co.*, 92 N. L. R. B., No. 251.) Thereupon Florio, in order to protect himself against the Statute of Limitations in the Taft-Hartley Act (U. S. Code, tit. 29, § 141 *et seq.*), filed a similar complaint before the national board, which has not yet taken action thereon.

Since the finding of unfair labor practice by the State board is supported by evidence, it is conclusive upon this court. (Labor Law, § 707, subd. 2; *Matter of Stork Restaurant* v. *Boland,* 282 N. Y. 256, 267; *Matter of N. Y. State Labor Rel. Bd.* v. *Union Club,* 295 N. Y. 917.) Respondent does not seriously contest the order on the merits. Its opposition is directed solely to the contention that the State board has no jurisdiction over its

labor practices, but that the national board is vested with exclusive jurisdiction thereof.

Two preliminary questions must be disposed of.

Respondent argues that the national board should have sole jurisdiction over the New York City taxicab industry because of its vital role in the war mobilization program, citing *Matter of Westport Moving & Stor. Co.* (91 N. L. R. B. 149). This is untenable. The National Labor Relations Act is confined to labor practices which affect commerce, and does not extend to those which may affect national defense.

Petitioner argues that its order should be enforced because it had assumed and completed the exercise of jurisdiction at a time when the national board was expressly disclaiming such jurisdiction. That argument is also untenable.

True, in *Consolidated Edison Co.* v. *National Labor Relations Bd.* (305 U. S. 197), the court said, per HUGHES, C. J. (pp. 223–224): " where the employers are not themselves engaged in interstate or foreign commerce, and the authority of the National Labor Relations Board is invoked to protect that commerce from interference or injury arising from the employers' intrastate activities, the question whether the alleged unfair labor practices do actually threaten interstate or foreign commerce in a substantial manner is necessarily presented. And in determining that factual question regard should be had to all the existing circumstances, including the bearing and effect of any protective action to the same end already taken under state authority. The justification for the exercise of federal power should clearly appear. *Florida* v. *United States,* 282 U. S. 194, 211, 212. But the question in such a case would relate not to the existence of the federal power but to the propriety of its exercise on a given state of facts."

The record of the State board is one of great success in avoiding industrial strife within the State. However, if the Federal power exists, " the propriety of its exercise on a given state of facts " is not subject to review in the State courts. If respondent's operations affect interstate commerce, the national board's assertion of jurisdiction supersedes all action by the State board. (*La Crosse Tel. Corp.* v. *Wisconsin Labor Relations Bd.,* 336 U. S. 18, 24–25; *Bethlehem Steel Co.* v. *New York State Labor Relations Bd.,* 330 U. S. 767, 772–773, 776.) On the other hand, the fact that the national board is customarily exercising jurisdiction over such companies does not establish the jurisdiction unless their operations affect interstate commerce. (*La Crosse* case, *supra; Bethlehem* case, *supra.*)

That brings us to the crucial issue of the case: is jurisdiction over Charman's labor practices conferred on the national board by the National Labor Relations Act? This provides as follows:

" Sec. 10. (a) The Board is empowered * * * to prevent any person from engaging in any unfair labor practice * * * affecting commerce ". (U. S. Code, tit. 29, § 160, subd. [a].)

" Sec. 2. When used in this Act * * * (6) the term ' commerce ' means trade, traffic, commerce, transportation, or communication among the several States * * * (7) the term ' affecting commerce ' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tended to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce ". (U. S. Code, tit. 29, § 152, subds. [6], [7].)

Respondent submits three grounds, each of which is claimed to establish that respondent's labor practices affect commerce. Respondent argues first, that each ground applies to its own individual activities. If this be not proved, respondent argues that each ground establishes the jurisdiction of the national board over the New York City taxicab industry as a whole, and that such jurisdiction therefore extends to respondent's individual activities.

The latter argument cannot be accepted. " Whether or not particular action does affect commerce in such a close and intimate fashion as to be subject to Federal control, and hence to lie within the authority conferred upon the board, is left by the statute to be determined as individual cases arise " (*National Labor Relations Bd.* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 32. See, to the same effect, *Santa Cruz Fruit Packing Co.* v. *National Labor Relations Bd.*, 303 U. S. 453, 467; *Consolidated Edison Co.* v. *National Labor Relations Bd.*, 305 U. S. 197, 222, *supra*, and *National Labor Relations Bd.* v. *Fainblatt*, 306 U. S. 601, 608.)

In some cases, where the court held that the individual employers' activities affected commerce on the " inflow " or " outflow " theory, the importance of the industry in interstate commerce was emphasized as confirming the finding in the individual case. See, e.g., steel (*Jones & Laughlin* case, 301 U. S. 1, 43, *supra*); men's clothing (*National Labor Relations Bd.* v. *Friedman-Harry Marks Clothing Co.*, 301 U. S. 58, 73-74); women's clothing (*Fainblatt* case, 306 U. S. 601, 607-608, *supra*), and insurance (*Polish Nat. Alliance* v. *National Labor Relations Bd.*, 322 U. S. 643, 648-649). But it does not follow that where

the activities of some or many of the employers in an industry do affect commerce, the national board thereby acquires jurisdiction over all employers in that industry, even those whose individual acts do not affect commerce. Indeed, if this contention of respondent's were true, it is difficult to understand why in each case the Supreme Court so meticulously examined the activities of the individual employer involved.

Nor may it be argued that the national board may take jurisdiction over an employer whose activities do not themselves affect commerce because he may be in direct and active competition with other employers in the same industry and in the same locality whose activities do affect commerce. Thus, the Fair Labor Standards Act (U. S. Code, tit. 29, § 201 *et seq.*) which covers employees " engaged in commerce or in the production of goods for commerce " was held applicable to the maintenance employees of an office building owned by an interstate producer and predominantly occupied by its own offices (*Borden Co.* v. *Berella,* 325 U. S. 679, 680–681), but inapplicable to the maintenance employees of an office building wherein space was rented to a large number of miscellaneous tenants, 48% of the space being occupied by concerns engaged in the production of goods for commerce. (*10 East 40th St. Bldg.* v. *Callus,* 325 U. S. 578, 581–582.) These two buildings are in close proximity to each other and presumably compete with each other for tenants. The maintenance employees of most office buildings in New York City (as to which one or the other of the foregoing cases would control) belong to the same union and are usually covered by the same bargaining agreement. If the wages and hours of employees of these buildings need not be kept on a competitive basis, I see no reason why labor relations of employees in the New York City taxicab industry must be administered on a uniform basis for those whose activities do and those whose activities do not affect commerce.

This is not like the situation where the Federal Government must control intrastate railroads in order to eliminate discrimination against interstate rates (*Shreveport* case, 234 U. S. 342, 351–352; *Railroad Comm. of Wisconsin* v. *Chicago, B. & Q. R. R. Co.,* 257 U. S. 563, 588); or the inspection of tobacco involved in intrastate transactions which is inextricably commingled in the same market with tobacco involved in interstate transactions (*Currin* v. *Wallace,* 306 U. S. 1, 11); or the purchase price of milk sold and consumed within the State where " its marketing is inextricably intermingled with and directly affects the marketing in the area of the milk which moves across state lines "

(*United States* v. *Rock Royal Co-op.*, 307 U. S. 533, 568) inasmuch as " the marketing of a local product in competition with that of a like commodity moving interstate may so interfere with interstate commerce or its regulation as to afford a basis for Congressional regulation of the intrastate activity." (*United States* v. *Wrightwood Dairy Co.*, 315 U. S. 110, 120.)

As respondent's first ground, it points out that the taxicab industry as a whole transports a large number of persons to and from the railroad terminals, bus terminals, La Guardia and New York International Airports, steamship piers and ferry piers. It may be conceded that a substantial percentage of the persons thus transported are about to start or have just completed a journey to or from another State or a foreign country. Only 6% of respondent's trips are to or from such points. I do not think such activities on respondent's part affect commerce.

In *United States* v. *Yellow Cab Co.* (332 U. S. 218), the complaint charged that " defendants have been and now are engaged in a combination and conspiracy to restrain and to monopolize interstate trade and commerce   *   *   *   in the business of furnishing cab service for hire in the City of Chicago," in violation of the Sherman Anti-Trust Act (Record on Appeal, fols. 11–12).

Defendant Yellow Cab Co. operated the " Yellow " taxicabs. Defendant Cabs Sales operated the " Checker " taxicabs under lease from defendant Checker Cab Co. Parmelee Transportation Co. operated the Parmelee Transfer System hereinafter described. The combination and conspiracy to restrain and monopolize consisted of a continuing concert of action under which defendants agreed:

" (c) Yellow and Cabs Sales will not attempt to compete with Parmelee for contracts with railroads or railroad terminal associations to transport passengers and their luggage between railroad stations in Chicago;

" (d) Parmelee will not compete with Yellow or Cabs Sales by seeking to engage, or engaging in the business of transporting passengers for hire in the City of Chicago and its vicinity except by contract with railroads and railroad terminal associations;

" (e) to reduce the total number of taxicabs operated in the City of Chicago to 3,000 and to oppose and prevent any increase in the number of said taxicabs and licensees above 3,000;

" (f) that Yellow and Checker will hold 2,595 of the 3,000 licenses issued by the City of Chicago   *   *   *; that they would secure and divide among themselves   *   *   *   any licenses above 3,000 which might be subsequently issued by the City of Chicago;   *   *   *

"(h) Yellow and Cabs Sales will not compete with each other by using a make or style of cab other than that manufactured by C. Cm or by providing more or better service to passengers; and

"(i) that Checker and Yellow would prevent new operations * * * from entering the cab business in Chicago" (fols. 12–13).

In connection with items (c) and (d), the complaint " points out the well-known fact that Chicago is the terminus of a large number of railroads engaged in interstate passenger traffic and that a great majority of the persons making interstate railroad trips which carry them through Chicago must disembark from a train at one railroad station, travel from that station to another some two blocks to two miles distant and board another train at the latter station. The railroads often contract with the passengers to supply between-station transportation in Chicago. Parmelee then contracts with the railroads and the railroad terminal associations to provide this transportation by special cabs carrying seven to ten passengers. Parmelee contracts are exclusive in nature " (332 U. S. 228).

In overruling defendant's demurrer in respect of this portion of the complaint the court said, per MURPHY, J. (pp. 228–229): " The transportation of such passengers and their luggage between stations in Chicago is clearly a part of the stream of interstate commerce. When persons or goods move from a point of origin in one state to a point of destination in another, the fact that a part of that journey consists of transportation by an independent agency solely within the boundaries of one state does not make that portion of the trip any less interstate in character. *The Daniel Ball,* 10 Wall 557, 565. That portion must be viewed in its relation to the entire journey rather than in isolation. So viewed, it is an integral step in the interstate movement. See *Stafford* v. *Wallace,* 258 U. S. 495."

In respect of items (e), (f), (h) and (i), the court said: " The interstate commerce toward which this aspect of the conspiracy is directed is claimed to arise out of the following facts. Many persons are said to embark upon interstate journeys from their homes, offices, and hotels in Chicago by using taxicabs to transport themselves and their luggage to railroad stations in Chicago. Conversely, in making journeys from other states to homes, offices and hotels in Chicago, many persons are said to complete such trips by using taxicabs to transport themselves and their luggage from railroad stations in Chicago to said homes, offices and hotels. Such transportation of persons and

their luggage is intermingled with the admittedly local operations of the Chicago taxicabs. But it is that allegedly interstate part of the business upon which rests the validity of the complaint in this particular.'' (P. 230.)

It will be noted that this is precisely the type of operation to which 6% of respondent's trips is devoted, on the basis of which it claims that its labor practices affect commerce. Defendants in the cited case, who operated 2,595 cabs, must have transported many more interstate passengers to and from railroad terminals than does respondent who operates only ten cabs. Yet the court held this portion of the complaint to be defective, saying (pp. 230–232): '' We hold, however, that such transportation is too unrelated to interstate commerce to constitute a part thereof within the meaning of the Sherman Act. These taxicabs, in transporting passengers and their luggage to and from Chicago railroad stations, admittedly cross no state lines; by ordinance, their service is confined to transportation ' between any two points within the corporate limits of the city.' None of them serves only railroad passengers, all of them being required to serve ' every person ' within the limits of Chicago. They have no contractual or other arrangement with the interstate railroads. Nor are their fares paid or collected as part of the railroad fares. In short, their relationship to interstate transit is only casual and incidental. * * * Moreover, what may fairly be said to be the limits of an interstate shipment of goods and chattels may not necessarily be the commonly accepted limits of an individual's interstate journey. We must accordingly mark the beginning and end of a particular kind of interstate commerce by its own practical considerations. Here we believe that the common understanding is that a traveler intending to make an interstate rail journey begins his interstate movement when he boards the train at the station and that his journey ends when he disembarks at the station in the city of destination. What happens prior or subsequent to that rail journey, at least in the absence of some special arrangement, is not a constituent part of the interstate movement. The traveler has complete freedom to arrive at or leave the station by taxicab, trolley, bus, subway, elevated train, private automobile, his own two legs, or various other means of conveyance. Taxicab service is thus but one of many that may be used. It is contracted for independently of the railroad journey and may be utilized whenever the traveler so desires. From the standpoints of time and continuity, the taxicab trip may be quite distinct and

separate from the interstate journey. To the taxicab driver, it is just another local fare."

The court reached this conclusion despite the arguments in the Government's brief (a) that it should follow the pronouncement in the concurring opinion of BRANDEIS, J., in *Delaware, L. & W. R. R. Co.* v. *Morristown* (276 U. S. 182, 198): "In these days, the ability of the traveler to obtain conveniently, upon reaching the street door of the station, a taxicab to convey him and his hand-baggage to his ultimate destination, is an essential of adequate rail transportation"; and (b) that the transportation service rendered by these taxicabs was analogous to the bus and trolley service used in the District of Columbia by passengers who transferred to or from a bus going to Virginia. (*United States* v. *Capital Tr. Co.*, 325 U. S. 357, 362–364.) In the second *Capital Transit* case, the court expressly reiterated this distinction between the interstate character of the connecting local bus or street car and the intrastate character of the local taxicab. (*United States* v. *Capital Tr. Co.*, 338 U. S. 286, 290.) In the latter case, the dissenting Justices feared that the decision's "unlimited language sweeps into the hands of the [Interstate Commerce] Commission the regulation of all local transportation that carries a large proportion of passengers destined for or arriving from out-of-state points. For example the court's ruling would seem to include the New York City commuter traffic moving by local bus, subway and streetcar service on its way to and from interstate busses" (338 U. S. 293). Yet they give no intimation that such "unlimited language" would extend to taxicabs.

Respondent argues that the *Yellow Cab* case is inapplicable here because it arose under the Sherman Act (U. S. Code, tit. 15, § 1 *et seq.*) which applies only to contracts and conspiracies "in restraint of trade or commerce among the several States" whereas the National Labor Relations Act covers unfair labor practices "affecting commerce." *Apex Hosiery Co.* v. *Leader* (310 U. S. 469) is cited as justification for this distinction.

In that case the court reversed a judgment for treble damages against a labor union which, by a sit-down strike, had prevented the shipment of hosiery destined for interstate commerce. The ground for the decision was that "the Sherman Act admittedly does not condemn all combinations and conspiracies which interrupt interstate transportation" (p. 486); that "The end sought was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detri-

ment of purchasers or consumers of goods and services'' (p. 493); and that the Act does not apply '' unless the restraint is shown to have or is intended to have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition'' (pp. 500–501). The court emphasized that '' we have sustained the application of the Wagner Act, * * * regulating labor relations ' affecting ' interstate commerce to situations no more closely related to the commerce than these, and where the interstate commerce affected was no greater in volume '' (p. 485).

The fallacy in this argument is that the restraints complained of in the *Yellow Cab* case, which were assumed to be true on demurrer (332 U. S. 224), were the very type of restraint which the *Apex* case said were subject to the Sherman Act. They restrained free competition in business and tended to raise prices or otherwise control the market to the detriment of consumers of services, and deprive them of the advantages which they derived from free competition. In fact, the complaint specifically alleged that the combination and conspiracy had such effect.

The court was thoroughly familiar with the reasoning of the *Apex* case, because that case was cited in sustaining another portion of the complaint which is not material here (332 U. S. 225). Nevertheless, the court dismissed the portions of the complaint dealing with taxicab transportation to and from railroad stations, not upon the ground that the restraints were not of the Sherman Act type as in the *Apex* case, but upon the express ground '' that such transportation is too unrelated to interstate commerce to constitute a part thereof within the meaning of the Sherman Act '' (p. 230), and that '' the common understanding is that a traveler intending to make an interstate rail journey begins his interstate movement when he boards the train at the station and that his journey ends when he disembarks in the city of destination '' (p. 231). Moreover, the restraints alleged in respect of taxicab transportation to and from railroad stations, which were held to be not in interstate commerce, were *in pari materia* with the restraints alleged in respect of taxicab transportation between railroad stations, which were held to be in interstate commerce. Under all of these circumstances, respondent's attempted distinction of the *Yellow Cab* case loses its force.

It is interesting to note in this connection that the *Yellow Cab* case has been interpreted to mean that employees of busses

operated solely between downtown Chicago and the Chicago Municipal Airport, and of trucks operated to carry trunks between Chicago railroad stations and residences or hotels, are not " engaged in commerce " within the meaning of the Fair Labor Standards Act. (*Cederblade* v. *Parmelee Transp. Co.,* 94 F. Supp. 965.)

Respondent argues finally that the force of the *Yellow Cab* case as authority is weakened by the following language in the court's opinion (332 U. S. 232–233): " We do not mean to establish any absolute rule that local taxicab service to and from railroad stations is completely beyond the reach of federal power or even beyond the scope of the Sherman Act. In *Stafford* v. *Wallace, supra,* [258 U. S.] 528, the Court made plain that nothing in the *Knight* Case was authority for the proposition that ' if such an agency [local cab service] could be and were used in a conspiracy unduly and constantly to monopolize interstate passenger traffic, it might not be brought within federal restraint.' Likewise, we are not to be understood in this case as deciding that all conspiracies among local cab drivers are so unrelated to interstate commerce as to fall outside the federal ken. A conspiracy to burden or eliminate transportation of passengers to and from a railroad station where interstate journeys begin and end might have sufficient effect upon interstate commerce to justify the imposition of the Sherman Act or other federal laws resting on the commerce power of Congress.

" All that we hold here is that when local taxicabs merely convey interstate train passengers between their homes and the railroad station in the normal course of their independent local service, that service is not an integral part of interstate transportation. And a restraint on or monopoly of that general local service, without more, is not proscribed by the Sherman Act."

This is no more than a reiteration of the familiar principle that " Competitive practices which are wholly intrastate may be reached by the Sherman Act because of their injurious effect on interstate commerce " (*United States* v. *Wrightwood Dairy Co.,* 315 U. S. 110, 120, *supra*); and that " monopolization of local business, where achieved by restraining interstate commerce, is condemned by the [Sherman] Act " (*Mandeville Is. Farms* v. *American Crystal Sugar Co.,* 334 U. S. 219, 235–236). The court, having found that the complaint charged these very defendants with Sherman Act violations in respect of their other activities, understandably inserted a caveat against having its decision interpreted as a license for these defendants to do

as they pleased in respect of transportation to and from railroad stations.

This reservation was construed in *Eastman* v. *Yellow Cab Co.* (173 F. 2d 874 [C. A., 7th Circuit]) where the court sustained a Sherman Act complaint by other taxicab drivers against these defendants saying (p. 880): " For the purpose of testing the sufficiency of the complaint we must assume, without deciding, that the allegations thereof are true. We, therefore, must assume that in Chicago a shortage of taxicabs exists which burdens the journeys of interstate passengers, and that such burdens result from the alleged conspiracy. The Supreme Court says, *United States* v. *Yellow Cab Co., supra*, 332 U. S. at page 233 \* \* \*: ' \* \* \* A conspiracy to burden or eliminate transportation of passengers to and from a railroad station where interstate journeys begin and end might have sufficient effect upon interstate commerce to justify the imposition of the Sherman Act. \* \* \* ' *In that case the court's attention was focused on taxicab passengers whose journeys began or ended at a Chicago railway station, in contrast to the complaint in the case at bar wherein the interference with the interstate journeys of passengers merely traveling through Chicago is given the most emphasis.* Although Parmelee operates with somewhat different type of motor vehicles, and has a contract with the railroads, it is difficult to discern any substantial difference in the status of an interstate passenger who uses a taxicab to travel from station to station, and the interstate passenger who uses Parmelee facilities. Yet the Supreme Court has squarely held that such Parmelee passengers are in interstate commerce. \* \* \* Construing the complaint in the light most favorable to plaintiffs, we hold that it does state a claim under the Sherman Act upon which relief can be granted. It is of course no valid objection that all of the relief asked for in the complaint and the amendments thereto cannot be granted. Likewise it is not a sufficient objection for defendants to urge that the travel in taxicabs by interstate passengers between railroad stations in Chicago has only a slight effect on interstate commerce." (Italics supplied.)

Other instances might arise where the foregoing reservation might apply. If many of the local taxicab companies, for example, should agree to divert to Grand Central Terminal passengers desiring to go to Pennsylvania Station, or vice versa, that might well state a Sherman Act violation. It is not necessary, however, to speculate on what the court might have had in mind in making the foregoing statement, or whether it had

any definite situation in mind. The decision clearly holds, in my opinion, that respondent's activities in transporting passengers to and from railroad terminals, etc., does not affect commerce to the extent of giving the national board jurisdiction over respondent's labor practices.

Respondent argues that its activities affect commerce because a successful taxicab strike " would leave stranded at depots, hotels and places of business hundreds of thousands of travelers encumbered by baggage, unfamiliar with our rapid and surface transportation system, or too ill to move by any form of transportation other than door-to-door transportation." Ordinarily a successful hotel strike would have a much more serious effect on travelers from without the State, probably making it impossible for many of them to come to New York, yet in *Matter of Hotel Assn. of St. Louis* (92 N. L. R. B., No. 215) the national board declined to assume jurisdiction over the St. Louis hotels, although the employers' members collectively did business annually amounting to over $15,000,000 and of the $6,000,000 received from room rentals, over $2,400,000 was received from out-of-State guests. The board quoted the following statement made by Senator Taft in the Senate without opposition being voiced by any other Senator: " ' A hotel performs its services within four walls. It ships nothing into commerce. It produces no goods for commerce. In my opinion the [Taft-Hartley] Act was never intended to cover the hotel industry ' (Congressional Record, 81st Congress, p. 12, 471)."

Respondent argues finally that although only 6% of its own trips involve transportation to and from railroad terminals, etc., the combination of these with similar trips of other local taxicab companies is enough in the aggregate to affect commerce. It cites the decisions in *National Labor Relations Bd.* v. *Fainblatt* (306 U. S. 601, 607–608, *supra*) to show that the Act covers even relatively small units which contribute in the aggregate a vast volume of interstate commerce but the small unit in that case was actually engaged in interstate commerce, while in the instant case none of the units is engaged in interstate commerce merely because of the fact that they transport interstate passengers to or from terminals. (*Yellow Cab* case, *supra*.)

Respondent's second ground is that taxicabs in New York City transport many passengers to buildings housing garment manufacturers, the Borden Building, which houses a company engaged in interstate commerce (see *Borden Co.* v. *Borella,* 325 U. S. 679, *supra*) and the various plants which actually produce

goods for commerce. No valid statistical evidence is offered on this point and no evidence whatsoever is offered to establish respondent's own participation in this type of transportation. Such evidence as was introduced is apparently designed to bring respondent's operations within the rule laid down in *Consolidated Edison Co.* v. *National Labor Relations Bd.*, 305 U. S. 197, *supra*; *National Labor Relations Bd.* v. *Baltimore Tr. Co.* (140 F. 2d 51), and the other public utility cases.

In the *Consolidated Edison* case, the jurisdiction of the national board was sustained over the utility whose operations were concededly intrastate because of the catastrophic effect which an interruption of its service would have upon concerns engaged in interstate commerce. The court said, per HUGHES, C. J. (pp. 219, 220–221): "The enterprise is one of great magnitude. The company serves over 3,500,000 electric and gas customers,— a large majority using the service for residential and domestic purposes. In 1936 the company supplied about 97.5 per cent. of the total electric energy sold in the City of New York and about one hundred per cent. of that sold in Westchester County. * * * In the present instance we may lay on one side, as did the Circuit Court of Appeals, the mere purchases by the utilities of the supplies of oil, coal, etc., although very large, which come from without the State and are consumed in the generation and distribution of electric energy and gas. Apart from those purchases, there is undisputed and impressive evidence of the dependence of interstate and foreign commerce upon the continuity of the service of the petitioning companies. They supply electric energy to the New York Central Railroad Company, the New York, New Haven and Hartford Railroad Company, and the Hudson and Manhattan Railroad Company (operating a tunnel service to New Jersey) for the lighting and operation of passenger and freight terminals, and for the movement of interstate trains. They supply the Port of New York Authority with electric energy for the operation of its terminal and the Holland Tunnel. They supply a majority of the piers of transatlantic and coastwise steamship companies along the North and East Rivers, within the City of New York, for lighting, freight handling and related uses. They serve the Western Union Telegraph Company, the Postal Telegraph Company, and the New York Telephone Company with power for transmitting and receiving messages, local and interstate. They supply electric energy for the transatlantic radio service of the Radio Corporation of America. They provide electric energy for the Floyd Bennett Air Field

in Brooklyn for various purposes, including field illumination, a radio beam and obstruction lighting. Under contracts with the Federal Government they supply electric energy for six lighthouses and eight beacon or harbor lights; also light, heat and power for the general post office and branch post offices, the United States Barge Office, the Customs House, appraisers' warehouse and various federal office buildings. It cannot be doubted that these activities, while conducted within the State, are matters of federal concern. In their totality they rise to such a degree of importance that the fact that they involve but a small part of the entire service rendered by the utilities in their extensive business is immaterial in the consideration of the existence of the federal protective power. The effect upon interstate and foreign commerce of an interruption through industrial strife of the service of the petitioning companies was vividly described by the Circuit Court of Appeals in these words: ' Instantly, the terminals and trains of three great interstate railroads would cease to operate; interstate communication by telegraph, telephone, and radio would stop; lights maintained as aids to navigation would go out; and the business of interstate ferries and of foreign steamships, whose docks are lighted and operated by electric energy, would be greatly impeded. Such effects we cannot regard as indirect and remote.' 95 F. 2d 390, 394.''

This principle was applied to sustain the national board's jurisdiction of other local gas and electric companies without whose service the instrumentalities of commerce in the areas involved would be unable to function. (*National Labor Relations Bd.* v. *Virginia Elec. & Power Co.*, 314 U. S. 469, 476–477; *Pueblo Gas & Fuel Co.* v. *National Labor Relations Bd.*, 118 F. 2d 304, 306 [C. A., 10th Circuit]; *Southern Colorado Power Co.* v. *National Labor Relations Bd.*, 111 F. 2d 539, 541–542.)

Similarly in *National Labor Relations Bd.* v. *Baltimore Tr. Co.* 140 F. 2d 51 [C. A., 4th Circuit], *supra*, certiorari denied 321 U. S. 795) the jurisdiction of the national board of the Baltimore Transit System was sustained, the court saying (p. 53): '' The company operates the street railway and bus transportation system serving the City of Baltimore, Md. and its environs. It operates 22 bus lines and some thirty street car lines, including three trackless trolleys, which serve practically every district of the city. At the time of the hearing, it had 1473 vehicles of which 1253 were in active use; and during the first four months of 1942, these vehicles carried 64,488,591 revenue passengers and traveled 12,235,627 vehicle miles. During 1941, they carried

160,050,096 revenue passengers and traveled 34,042,730 vehicle miles. Much of this traffic is intimately connected with industry. The evidence shows that during the morning rush hours, the company carries approximately 100,000 passengers to outlying industrial areas and approximately 90,000 passengers to the heart of the city where wholesale and manufacturing districts are located. While the vehicles of the company do not cross state lines, there can be no question that they carry to and from work thousands of passengers who are engaged in the production of goods that flow in interstate commerce. Many of the great industrial and manufacturing corporations of the country have plants in the city of Baltimore or vicinity and large numbers of their employees use the cars and buses of the company as a means of getting to and from their work. It appears from the evidence that of 147,000 employees of 47 of the city's largest industrial concerns approximately 45,000 are dependent upon the company's cars and buses for transportation to and from work. These concerns are engaged in interstate commerce on a large scale, bringing into the state annually goods valued at over $271,000,000 and shipping out goods of a value exceeding $500,000,000.''

This principle was likewise applied to sustain the national board's jurisdiction over other local street car and bus companies without whose service the instrumentalities of commerce in the cities involved would be unable to function. (*National Labor Relations Bd.* v. *Fort Worth Tr. Co.,* 187 F. 2d 792, 793 [C. A., 5th Circuit].)

A comparison of the evidence adduced in the case at bar with that discussed in the cited cases indicates that it has not established that the New York City taxicab industry as a whole comes within the local utility rule. A fortiori that requirement has not been met in respect of respondent's own operations, since no evidence at all has been presented on that score nor does the evidence bring the taxicab industry or respondent within the cases upholding the board's jurisdiction over insurance companies (*Polish Nat. Alliance* v. *National Labor Relations Bd.,* 322 U. S. 643, 648–649, *supra*) and banks (*National Labor Relations Bd.* v. *Bank of America,* 130 F. 2d 624–626 [C. A., 9th Circuit], certiorari denied 318 U. S. 791).

Respondent's final ground for resisting jurisdiction is the so-called "inflow" theory. This had been expressly rejected by the national board when it declined jurisdiction of the New York City taxicab industry in the first *Skyview* case (90 N. L. R. B., No. 268, p. 1895), where the employer received a much

greater inflow of goods from without the State than this respondent does. In the second *Skyview* case (92 N. L. R. B., No. 251), the board assumed jurisdiction solely upon the ground that 6% of the trips made by the employer's taxicabs was to or from established points of ingress and egress from New York by rail, bus, air, and water carriers.

The disposition of this problem is not effected by merely applying the concepts of " local," " indirect," " incidental " or " remote." (See discussion by JACKSON, J., in *Wickard* v. *Fillburn,* 317 U. S. 111, 119–125, and by RUTLEDGE, J., in *Mandeville Is. Farms* v. *American Crystal Sugar Co.,* 334 U. S. 219, 229–235, *supra.*) The subject was thus analyzed by HUGHES, C. J., in *Santa Cruz Fruit Packing Co.* v. *National Labor Relations Bd.* (303 U. S. 453, 466–467, *supra*): " *Third.* It is also clear that where federal control is sought to be exercised over activities which separately considered are intrastate, it must appear that there is a close and substantial relation to interstate commerce in order to justify the federal intervention for its protection. However difficult in application, this principle is essential to the maintenance of our constitutional system. The subject of federal power is still ' commerce,' and not all commerce but commerce with foreign nations and among the several States. The expansion of enterprise has vastly increased the interests of interstate commerce but the constitutional differentiation still obtains. *Schechter Corporation* v. *United States,* 295 U. S. 495, 546. ' Activities local in their immediacy do not become interstate and national because of distant repercussions.' *Id.,* p. 554. To express this essential distinction, ' direct ' has been contrasted with ' indirect,' and what is ' remote ' or ' distant ' with what is ' close and substantial.' Whatever terminology is used, the criterion is necessarily one of degree and must be so defined. This does not satisfy those who seek for mathematical or rigid formulas. But such formulas are not provided by the great concepts of the Constitution such as ' interstate commerce,' ' due process,' ' equal protection.' "

Respondent purchased fourteen taxicabs in New York City during the years 1946 and 1947 for approximately $30,000 but apparently purchased no others up to the time of the hearing before the board. These cabs were purchased in Long Island City from James F. Waters Co., a New York corporation, which has its cabs manufactured in Detroit and driven to its Long Island City plant. The design and volume of the cabs manu-

factured in Detroit is influenced by the demand in the New York City market.

From January, 1947, to June, 1949, respondent purchased automobile parts from dealers in New York City in the sum of $61,086. These parts are generally manufactured outside of the State.

Respondent rents tires at a cost of approximately $2,000 per year. These are rented from the General Tire and Rubber Company, an Ohio corporation which manufactures these tires outside of New York under a type of design made especially for the taxicabs of New York City. The rental contract was made with General's Ohio office, but the rental payments are made to its New York office. Title to the tires remains with General, which includes them as part of its general inventory and which has personnel working directly on the premises of respondent and its other lessees.

From January 1, 1947, to June 1, 1949, respondent purchased from the landlord of its garage gasoline amounting to $39,391.65. This gasoline came in from outside the State.

Applying to these facts the principles laid down in the decided cases, I conclude that respondent's operations do not affect commerce under the " inflow " theory.

In *National Labor Relations Bd.* v. *Jones & Laughlin Steel Corp.* (301 U. S. 1, *supra*) the first case under the National Labor Relations Act, the court found that respondent's operations affected commerce, saying per HUGHES, C. J. (pp. 34–35, 41): " The various parts of respondent's enterprise are described as interdependent and as thus involving ' a great movement of iron ore, coal and limestone along well-defined paths to the steel mills, thence through them, and thence in the form of steel products into the consuming centers of the country — a definite and well-understood course of business.' It is urged that these activities constitute a ' stream ' or ' flow ' of commerce, of which the Aliquippa manufacturing plant is the focal point, and that industrial strife at that point would cripple the entire movement. Reference is made to our decision sustaining the Packers and Stockyards Act. *Stafford* v. *Wallace,* 258 U. S. 495. The Court found that the stockyards were but a ' throat ' through which the current of commerce flowed and the transactions which there occurred could not be separated from that movement. Hence the sales at the stockyards were not regarded as merely local transactions, for while they created ' a local change of title ' they did not ' stop the flow,' but merely changed the private interests in the subject of the current.

\* \* \* Giving full weight to respondent's contention with respect to a break in the complete continuity of the ' stream of commerce ' by reason of respondent's manufacturing operations, the fact remains that the stoppage of those operations by industrial strife would have a most serious effect upon interstate commerce. In view of respondent's far-flung activities, it is idle to say that the effect would be indirect or remote. It is obvious that it would be immediate and might be catastrophic."

In the companion case of *National Labor Relations Bd.* v. *Fruehauf Trailer Co.* (301 U. S. 49) the court upheld jurisdiction over a trailer manufacturer, where more than 50% in value of the materials used by it in manufacture and shipping were transported to its Detroit plant from outside the State, and more than 80% of its sales consisted of products shipped outside the State, saying: " The manufacturing and assembly operations at the Detroit plant are essentially connected with and dependent upon the purchase, sales and distribution operations without the State of Michigan " (p. 54).

In the case of *National Labor Relations Bd.* v. *Friedman-Harry Marks Clothing Co.* (301 U. S. 58, *supra*) the court upheld jurisdiction over a men's clothing manufacturer where over 99% of the goods used in manufacture were received in its Richmond, Virginia, plant from outside the State, and 82.8% of the garments manufactured by it were purchased by customers outside the State (pp. 72–73).

*National Labor Relations Bd.* v. *Fainblatt* (306 U. S. 601, *supra*) involved a " contract shop " in Somerville, New Jersey, employing 200 people. It processed materials into various types of women's sports garments under contract with Lee Sportswear Company, a New York City concern which shipped the materials (to which it retained title) to respondent from outside New Jersey, and then shipped the finished garments to itself in New York or to its customers through the United States. The court held that " interstate commerce was involved in the transportation of the materials to be processed across state lines to the factory of respondents and in the transportation of the finished product to points outside the state for distribution to purchasers and ultimate consumers." Regardless of whether title was retained by Lee (p. 605) the court then said, per STONE, J. (pp. 606, 607–608): " Nor do we think it important, as respondents seem to argue, that the volume of the commerce here involved, though substantial, was relatively small as compared with that in the cases arising under the National Labor Relations Act which have hitherto engaged our attention. The

powers of Congress to regulate interstate commerce is plenary and extends to all such commerce be it great or small * * *. The language of the National Labor Relations Act seems to make it plain that Congress has set no restrictions upon the jurisdiction of the Board to be determined or fixed exclusively by reference to the volume of interstate commerce involved.''

In *National Labor Relations Bd.* v. *Bradford Dyeing Assn.* (310 U. S. 318) respondent dyed and finished goods in Bradford, Rhode Island. Here, as in *Fainblatt's* case, respondent's customers retained title to the goods, which they shipped into Rhode Island from other States and which were then shipped back to them. Respondent itself both bought and sold goods outside of Rhode Island. In sustaining jurisdiction the court said, per BLACK, J. (p. 326): '' It is settled that the Act is applicable to a processor, who constitutes even a relatively small percentage of his industry's capacity, where the materials processed are moved to and from the processor by their owners through the channels of interstate commerce, and it is not material, as the court below thought, that respondent's customers might be able to secure the same services from other Rhode Island processors if a later dispute should stop the interstate flow of materials to and from respondent's plant. Since the purpose of the Act is to protect and foster interstate commerce, the Board's jurisdiction can attach, as here, before actual industrial strife materializes to obstruct that commerce.''

All of the foregoing cases proceeded on '' the stream of commerce '' involving both inflow and outflow across State lines. In *Santa Cruz Fruit Packing Co.* v. *National Labor Relations Bd.* (303 U. S. 453, *supra*) there was no inflow but 37% of the fruits and vegetables packed by respondent was shipped in interstate or foreign commerce. The court upheld jurisdiction on the reasoning of the *Jones & Laughlin* case (*supra*) saying, per HUGHES, C. J. (pp. 464–465): '' Petitioner urges that the principle is inapplicable here as the fruits and vegetables which petitioner prepares for shipment are grown in California and petitioner's operations are confined to that State. It is not a case where the raw materials of production are brought into the State of manufacture and the manufactured product is handled by the manufacturer in other States. In view of the interstate commerce actually carried on by petitioner, the conclusion sought to be drawn from this distinction is without merit. The existence of a continuous flow of interstate commerce through the State may indeed readily show the intimate relation of particular transactions to that commerce. *Stafford* v. *Wallace,* 258 U. S.

495, 516; *Chicago Board of Trade* v. *Olsen,* 262 U. S. 1, 33. But, as we said in the *Jones & Laughlin* case, the instances in which the metaphor of a ' stream of commerce ' has been used are but particular, and not exclusive, illustrations of the protective power which Congress may exercise. ' The congressional authority to protect interstate commerce from burdens and obstructions is not limited to transactions which can be deemed to be an essential part of a '' flow '' of interstate or foreign commerce. Burdens and obstructions may be due to injurious actions springing from other sources.' *Id.,* p. 36. Such injurious action burdening and obstructing interstate trade in manufactured articles may spring from labor disputes irrespective of the origin of the materials used in the manufacturing process.''

The converse of this situation, that inflow of materials from outside the State without the outflow of materials is enough to confer jurisdiction, was first suggested in the *Consolidated Edison* case (305 U. S. 197, *supra*). The court there laid it aside inasmuch as jurisdiction could be rested on the public utility theory. The inflow theory was used as an additional ground to the public utility theory in *Pueblo Gas & Fuel Co.* v. *National Labor Relations Bd.* (118 F. 2d 304, *supra*).

Apparently the first case holding the inflow theory to be sufficient in and of itself is *National Labor Relations Bd.* v. *Hudson Co.* (135 F. 2d 380, certiorari denied 320 U. S. 740) involving the large Hudson department store in Detroit. This holding was followed by the 8th Circuit in two cases affecting department stores. (*Brandeis & Sons* v. *National Labor Relations Bd.,* 142 F. 2d 977, 980, certiorari denied 323 U. S. 751; and *National Labor Relations Bd.* v. *May Dept. Stores Co.,* 146 F. 2d 66, 68, mod. and affd. 326 U. S. 376.) It was accepted by the Supreme Court in connection with other factors in the case of a department store. (*Local 74* v. *National Labor Relations Bd.,* 341 U. S. 707.)

The Supreme Court has completely indorsed this principle in the *Denver* case (341 U. S. 675) and the *Greenwich* case (341 U. S. 694) both decided June 4, 1951. Petitioner seeks to distinguish these cases upon the ground that they involve secondary boycotts and that '' the National Board has deemed itself to be under a special congressional mandate to stretch its jurisdiction to the furthest limit.'' This distinction is untenable, because (as already pointed out) if the jurisdiction does exist the propriety of its exercise is not subject to review in the State courts. It is true, however, that it is not necessary that the immediate employer's activities affect commerce; jurisdiction will rest in

the national board if the third party against whom the secondary boycott is directed is in activities which do affect commerce. (*United Brotherhood of Carpenters* v. *Sperry*, 170 F. 2d 863, 868 [C. A., 10th Circuit].)

In *National Labor Relations Bd.* v. *Denver Bldg. & Constr. Trades Council* (341 U. S. 675) the union picketed a general contractor in order to compel Gould & Preisner, a subcontractor, to employ union labor. In sustaining the jurisdiction of the national board, the court said, per BURTON, J. (pp. 683–685): "The Board found that, in 1947, Gould & Preisner purchased $86,560.30 of raw materials, of which $55,745.25, or about 65%, were purchased outside of Colorado. Also, most of the merchandise it purchased in Colorado had been produced outside of that State. While Gould & Preisner performed no services outside of Colorado, it shipped $5,000 of its products outside of that State. Up to the time when its services were discontinued on the instant project, it had expended on it about $315 for labor and about $350 for materials. On a 65% basis, $225 of those materials would be from out of the State. The Board adopted its examiner's finding that any widespread application of the practices here charged might well result in substantially decreasing the influx of materials into Colorado from outside the State and it recognized that Gould & Preisner's annual purchase of over $55,000 of such materials was not negligible. The Board also adopted the finding that the activities complained of had a close, intimate and substantial relation to trade, traffic and commerce among the states and that they tended to lead, and had led, to labor disputes burdening and obstructing commerce and the free flow of commerce. The fact that the instant building, after its completion, might be used only for local purposes does not alter the fact that its construction, as distinguished from its later use, affected interstate commerce. * * * The maxim *de minimis non curat lex* does not require the Board to refuse to take jurisdiction of the instant case."

In the *Greenwich* case, Giorgi, a contractor in New York, employed two New York subcontractors (an electrician and a carpenter) in building a house in Greenwich, Conn. Patterson, the union delegate, directed the carpenter's (Deltorto's) workers to leave the job because the electrician (Langer) employed non-union help. In upholding the jurisdiction, the Second Circuit said, per LEARNED HAND, Ch. J. (*International Brotherhood* v. *National Labor Relations Bd.*, 181 F. 2d 34, 36–37): "Langer's activities would alone be enough. In order to perform his part of the work, small though it was, he had to go from New York

to Connecticut; and the materials which he uséd upon the job he had to bring from New York. Besides, his general business required him continuously to import substantial amounts of material from other states into New York, and he did a substantial amount of work in Connecticut in addition to the job in question, as well as work for large contractors whose own interstate activities were very large indeed. Giorgi's headquarters were also in New York, whence, like Langer, he had to travel to Greenwich to supervise his employees; moreover, the materials which he used upon the job he had brought from New York; and his business, again like Langer's extended into other states in substantial amount. It was Patterson's purpose to put an end to Langer's activities on the house by preventing Deltorto from proceeding with his contract, and thus compelling Giorgi to get rid of Langer. It is idle to argue therefore that Patterson's acts did not immediately ' affect,' or that they were not designed to ' affect,' these interstate activities. Insignificant as they were, they were enough to satisfy the demands of the Act. Moreover, since the decision may determine Langer's general operations which extend to many other interstate transactions, it may well be that the Board would have had jurisdiction, even though this particular dispute had involved no more than if the house had been in Port Chester, New York.'' (Footnotes omitted.)

The Supreme Court affirmed (341 U. S. 694) saying (p. 699): '' The facts, which were found in detail in the intermediate report, approved by the Board and upheld by the court below, are in our opinion sufficient to sustain that jurisdiction on the grounds stated in the *Denver* case, *ante,* p. 675. In addition, the contractor and both subcontractors in the instant case had their principal places of business in New York. The performance of their contractual obligations on this project in Connecticut accordingly emphasizes the interstate movement of the services and materials which they here supplied.''

Applying these cases to the fullest extent, I do not see how they cover respondent's operations. It purchased its taxicabs and parts and gasoline within the State, and rented its tires within the State, from persons who had acquired complete ownership thereof. True, the source of many, if not most, of these items was without the State. Similarly the corner grocer who buys his stock locally is receiving for sale, goods, a large percentage of which originated without the State, but I do not suppose that fact places him under the jurisdiction of the national board. The Act does not expressly cover goods '' held

for sale after shipment in interstate commerce." (Cf. *United States* v. *Sullivan,* 332 U. S. 689, 696–697.)

Petitioner's motion for an enforcement order is accordingly granted.

In my opinion the legal question presented is a close one and accordingly execution under the order will be stayed pending appeal provided respondent gives adequate security for payment of any back wages ultimately found due to Florio. Settle order.