Henry Clay Greenberg, J.
The petitioner, New York State Labor Relations Board, seeks enforcement of its final order of June 18, 1953, against respondent, Wags Transportation System, Inc., a New York City taxicab company. The State Board found that respondent had violated substantive provisions of the New York State Labor Relations Act (Labor Law, § 700 et seq.) which are, in their pertinent terms, the same as corresponding sections of the Labor Management Relations Act, 1947, as amended (U. S. Code, tit. 29, § 151 et seq.; § 158, subd. [a], pars. [1], [3]). (Interference, restraint and coercion of employees, Labor Law, § 704, subd. 10; Federal Act, § 8, subd. [a], par. [1]; spying and surveillance, Labor Law, § 704, subd. 1; Federal Act, § 8, subd. [a], par. [1]; discharges, Labor Law, § 704, subds. 4, 5; Federal Act, § 8, subd. [a], par. [3]; refusal to reinstate, Labor Law, § 704, subds. 4, 5; Federal Act, § 8, subd. [a], par. [3].)
There is no direct or positive conflict in these provisions of the Acts and thus no basis for rejection of State jurisdiction on this account is repugnant to or irreconcilable with Federal legislative objectives, although there are inconsistencies between the two Acts in respects which will be later treated. (Kelly v. Washington, 302 U. S. 1.) The issue here is clearly one of jurisdiction. The dispute and actions from which the charges stem occurred in 1948.
The petitioner claims, and it is a fact, that in 1948, when the acts complained of took place and this proceeding was instituted, the National Labor Relations Board (N. L. R. B.) had a long-standing policy of declining jurisdiction, as a matter of discretion, over the operations of taxicab companies. It was that board.’s position that the enterprise in question, while not entirely unrelated to interstate commerce, was predominantly local in character. In fact, between 1935 and November 21, 1950, the National Board asserted jurisdiction over taxicab companies in only five cases. (Matter of Texarkana Bus Co., 26 N. L. R. B. 582 [1940]; Matter of Taxicabs of Cincinnati, 82 N. L. R. B. 664 [1949]; Matter of Bussard Taxi & Bus Service, 81 N. L. R. B. 1181 [1949]; Matter of Yellow Cab Co., 88 N. L. R. B. 282 [Jan. 1950]; Matter of Hickey Cab Co., 88 N. L. R. B. 327 [Jan. 1950].)
After the institution of this proceeding in 1948, the board continued to refuse to assert jurisdiction over taxicab operations in the following cases: Matter of Yellow Cab Co. of California (90 N. L. R. B. 1884 [1950]); Matter of Skyview Transp. Co. (90 N. L. R. B. 1895 [1950]); Matter of Brooklyn Cab *803 Corp. (90 N. L. R. B. 1898 [1950]). (These cases were all disposed of in the earlier months of 1950.)
A few months later, however, and in November, 1950, the National Board reversed itself and exercised jurisdiction in the Skyvieiv case (92 N. L. R. B. 1664; see Matter of Skyview Transp. Co., 90 N. L. R. B. 1895, supra) over a New York company which carried passengers to and from interstate carrier terminals such as Grand Central and Pennsylvania stations, but which did not have an exclusive franchise to receive passengers at taxi stations located at the entrance to those terminals. The record of the N. L. B. B. shows that the Skyview Company operated a small fleet of cabs. It did not include all or even the major part of the cabs of New York City which bear the insignia “ Skyview ”. That insignia shows the make of the cab. The manufacturer or distributor of the cabs had no corporate or financial relationship with the cab company other than that of seller and purchaser. Similarly the National Board assumed jurisdiction in a case involving a taxi company with an exclusive private franchise. (Matter of Red Cab, 92 N. L. R. B. 175 [1950].)
In December, 1952 the National Board again modified its jurisdictional policy in this field and declined jurisdiction in Matter of Cambridge Taxi Go. (101N. L. B. B. 1328 [Dec. 1952]), but in its opinion announced the following rule, which it would appear represents that board’s final considered judgment in the taxicab field and sets forth a policy which that board announced for future guidance (p. 1329): “ we have concluded that it will not effectuate the policies of the Act to assert jurisdiction over the taxicab companies, except in those instances where both of the following factors are present: (1) The employer is either the sole taxicab company operating in the area served by its cabs, which service instrumentalities of commerce, or is the holder of a contract, license, or franchise from some instrumentality of commerce, granting to the employer the privilege or right to serve, either exclusively or concurrently with others, a depot or terminal of such instrumentality; and (2) the employer derives a substantial portion of its total revenue directly from carrying passengers to and from terminals or depots of these instrumentalities of commerce.”
Apparently the National Board recognized that the time for some consistency had arrived. Our attention must be focused upon the picture as it existed at the time that the State Board assumed jurisdiction and simultaneously upon the norms laid *804 down by the decisions of the higher courts and the National Board itself in determining whether the case here must be channeled through the national or the State jurisdiction.
Petitioner argues that the then prevailing policy of the National Board in declining or refusing to assume jurisdiction permitted the application of the State Labor Act to respondent’s labor relations. It goes further and contends that if this were not the case, there would be no forum where relief could be obtained, and labor disputes would not be regulated at all. This, emphasizes the petitioners, would create a “ no man’s land ” in labor relations, a situation and condition not contemplated by the Congress and resulting in intolerable confusion.
The respondent contends that the New York Board does not have jurisdiction because its operations affect interstate commerce, and that the Federal Act (commonly known as the TaftHartley Act) confers jurisdiction upon the National Labor Relations Board to the exclusion of the State Board. The National Board, it urges, is vested with the exclusive power in all cases touching interstate commerce to the total exclusion of State power, interstate agency or State courts. Such exclusive power, it further contends, cannot be made to depend upon an election to act or not to act and failure of action does not open the door already closed to State action. In other words, the mere existence of jurisdiction in the National Board is sufficient to bar State interference.
We must now observe the factual scene.
Hearings proceeded before the State Board on the charge relating to unfair labor practices. It was not until July 29,1949, upon the occasion of interposing objections to the report of the State Board, that respondent challenged its jurisdiction. By that time the Statute of Limitations provided in the Taft-Hartley Act for the filing of unfair labor practice complaints had expired, and the National Board had no retroactive jurisdiction. Nevertheless, hearings on the challenge were held, jurisdiction sustained and thereafter the final order of June, 1953 on the merits was made. In retaining jurisdiction, the determination of the Staite Board did not rest upon any finding that the taxicab company’s operation affected interstate commerce. It rested rather upon the claimed constitutional State power to act in the absence of action by the National Board and (that board’s asserted refusal to assume jurisdiction. Parenthetically it should be pointed out that the State Board issued its final decision and order in this proceeding after the National Board decided the Cambridge case (101 N. L. R. B. 1328, supra), to which reference has heretofore been made.
*805 Respondent Wags is one of 29 corporations which constitute Terminal System, Inc. Twenty-seven of these interrelated corporations operate taxicabs. Each corporation has the same officers, directors and stockholders. Terminal does not operate any vehicles. It does not own or operate any taxicabs. It has however entered into agreements with the New York Central R. R. Co., and the trustees of the N. Y., N. H. & Hartford R. R. Co., Pennsylvania Tunnel and Terminal R. R. Co., and the Pennsylvania R. R. Co., the Delaware, Lackawanna and Western R. R. Co., the Central R. R. of New Jersey and Capitol Greyhound Bus Terminal for the exclusive right, on behalf of corporations, with which it may contract, to maintain taxicabs in the terminals of said companies. It has entered into agreements with the corporations constituting the “Terminal System” to carry out the purposes of such agreements with said railroad and bus companies.
The instant respondent Wags directly owns and operates 57 taxicabs and is the purchasing agent for the other Terminal corporations, and in addition administers Terminal’s office, central repair shop and the affairs of the other 14 corporations in the system which operate from Terminal’s Manhattan- garage. It collects the driver revenue from all of the Manhattan cabs, deducts pro rata administrative expense and disburses the remainder to the Manhattan corporations. Accordingly Terminal System is, under Labor Board practice, considered as a single unit .to determine the effect on interstate commerce. (Matter of Knaust Bros., 36 N. L. R. B. 915; Matter of Cashman Auto Co., 98 N. L. R. B. 832.)
The railroads -serving the city are centralized primarily in two great terminals — Grand Central Terminal and Pennsylvania Station. Grand Central Terminal serviced approximately 14,-750,000 passengers who arrived from or were destined for points outside New York State in 1948. The “Terminal System” operates the taxicab ramp at the westerly end of the main con - course level of the Grand Central Terminal, and the number o f taxicab calls at .such ramp averaged between 2,000 and 2,200 per day. Substantial numbers of passengers using the railroads in interstate travel are serviced by taxicabs and from one third to two thirds of the interstate passengers arriving daily at Grand Central Station on the Twentieth Century Limited utilized taxicab service from the station.
The Pennsylvania Railroad Station serviced 35,807,845 passengers who arrived from or were destined for points outside New York State in 1947, and 32,655,968 of such interstate passengers in 1948. The “Terminal System” controls the 33rd *806 Street ramp of the station, and this ramp handles between 2,600 and 2,800 taxicab calls per day. Approximately between 90% of the calls were handled by ‘Terminal System ’ ’ cabs. Furthermore, the 31st Street ramp of the station, which handles approximately 800 incoming calls and approximately 400 outgoing calls per day is serviced to the extent of 50% by Terminal System” cabs.
The ‘ ‘ Terminal System” makes special arrangements to provide taxicab service when the big trains come into the Pennsylvania Station from Florida or Washington, D. C. The consistent sudden increased taxi-cab passengers at the time of the arrival of these trains could only lead to the conclusion that the taxicabs are carrying out railroad passengers brought in by those trains. This was confirmed by the fact that many of the persons getting into the taxicabs carried baggage or were attended by Bed Gaps.
The records of the Terminal System” disclosed that between March, 1949 and February, 1950, its taxicabs had made 1,641,608 trips with passengers from Grand Central Terminal -and Pennsylvania Station. This -did not include trips to these terminals or calls to or from other interstate carriers, including those with which the System” has exclusive servicing arrangements. Such trips from Grand Central Terminal and Pennsylvania Station alone constituted 14.49% of all the trips made by taxicabs of the “Terminal System”.
The ‘ Terminal System” has arrangements and obligations for servicing the Capitol Greyhound Bus Terminal. This is the terminal for four Greyhound Bus Companies 'and -seven other bus lines, all engaged in interstate commerce. In the period January, 1947 to April 30, 1949, 1,405,000 passengers departed from the Capitol Bus Terminal. Approximately the same figure would represent incoming passengers. Almost all of these 2,810,000 bus passengers were carried in interstate commerce.
The “Terminal System” does work with the airlines. The Port of New York Authority has jurisdiction over La Guardia Airport and New York International Airport. It appears that in 1947 and 1948 92% of the passengers at La Guardia Airport were engaged in interstate travel. From figures supplied by the Port Authority a minimum of 5,642,309 passengers serviced at La Guardia Airport in 'the period January 1, 1947, to April, 1949 were engaged in interstate travel. At New York International Airport interstate or foreign travelers totaled 116,534 in the period 1948 and 1949. Twenty-six and six tenths per cent of airline passengers using La Guardia Airport were serviced by taxicabs. Accordingly, in the period January 1,1947 to April, *807 1949, 1,500,854 such interstate passengers were so serviced. At New York International Airport, the estimate on passengers using cabs is 25%.
The ‘‘Terminal System” furnishes cab service under its exclusive contracts with the Central Railroad Company of New Jersey and the Delaware, Lackawanna and Western Railroad Company. These carriers provide ferry boat services between New York and New Jersey. In 1947,12,128,352 passengers were transported by that ferry line between New York City and the company’s Jersey City terminal. The figure for 1948 was 10,671,149.
The City of New York is one of the world’s greatest ports for steamship travel. Taxicabs are used in the main at the various piers throughout the city. Some of the piers have means of mass transportation like crosstown buses, a short distance removed. However, there is no north and south transportation along the waterfront streets- except taxicabs. During the period April 10, 1949, to May 20,1949, a total of 33,167 steamship passengers arrived in the Port of New York and 12,990 cab calls were made for such passengers. The percentage of steamship travelers using taxicab service was better than 33%% of the total. The percentage would appear to be much higher where the large ocean liners are involved, since on the arrival of The Queen Mary on May 15, 1949, there were 746 cab calls for the 1,551 passengers. And presumably more than one passenger on the average traveled in each cab.
After the outbreak of hostilities in Korea, the civilian defense authorities in the New York area called upon the New York City taxicab industry to form an emergency taxi corps. The companies constituting the ‘ ‘ Terminal System ’ ’ are a part of the emergency taxi corps. This corps was to provide emergency transportation after the all-clear signal following an air raid to police', defense and armed forces personnel.
The key role of taxicabs under emergency and, particularly, wartime emergency conditions, is not of novel origin. During the last war, Federal jurisdiction over the industry was assumed by the Office of Defense Transportation, and in the periods of most acute crisis, adequate gasoline and tire allotments were made to insure continued operation of taxicabs. The National War Labor Board accepted and acted upon labor disputes in this industry so as to preserve labor peace and uninterrupted operation.
In the metropolis of New York, an interruption of taxicab service in time of war would be a direct and serious blow, not alone to the stepped-up rate of activity in commerce, but to the *808 movement and transportation of defense and military personnel traveling on official business. It would, likewise, deprive the civilian defense authorities and the military of a needed instrument to combat the health and safety hazards and business dislocations following on the heels of an air attack on a city of this kind.
We have already seen that (the National Board’s jurisdictional test laid down in the Cambridge case (101 N. L. R. B. 1328, supra) for taxicab companies is twofold. The company must have or participate in an exclusive franchise for service to interstate terminals' and the revenue derived from such service must be a substantial portion of its total revenue. The first element is clearly established by the record and the factual recital here more than adequately meets the second factor set down by the National Board for jurisdictional interference. The extent of the dependence of interstate travelers on taxicab transportation is apparent. The full extent of that dependence is particularly marked in a city as large and as difficult to find one’s way about in as New York.
The figures which have been analyzed emphasize this fact. New York City lies athwart the channel of north-south railroad and bus lines. It is the main east coast terminal of cross-country travel from every quarter of the United States. In such a situation it is inevitable that the National Board would now assert its jurisdiction over the .respondent, based upon its participation in Terminal’s exclusive franchise. Whatever the situation may have been in 1948 when these proceedings were instituted, it does not pertain since December, 1952. If the National Board would not assert jurisdiction over exclusive franchise holders or participants serving the railroad 'and bus .terminals of this greatest of interstate terminal cities, it would not find any taxicab company qualified under the Cambridge (supra) criteria.
Th important question to determine, however, is whether or not when these proceedings were commenced in 1948 the National Board would have assumed jurisdiction, and more importantly, whether it bad the right under the positive mandate of the Taft-Hartley Act to decline jurisdiction. With respect to the first of these questions, the State Board does not contend that the National Board would not today assert jurisdiction over Wags. Its limited argument is that it would not have done so in 1948, and since the labor union had no available remedy in 1948, and since further it is barred now because of the Statute of Limitations and the National Board’s refusal to apply its rules retroactively, it is left completely without any remedy.
*809 Few fields have been so thoroughly plowed judicially as that concerning the scope of the application of the Labor Management Relations Act, since its validity was upheld in Labor Bd. v. Jones & Laughlin (301 U. S. 1). It has been held frequently that small operations (here the operation is large in scope) do affect interstate commerce within the definition of the act and the National Board’s jurisdiction. Since Wideard v. Filburn (317 U. S. 111) the reach of that power to seemingly local enterprises cannot be challenged. That case involved the validity of applying Federal acreage control to a farmer who grew a crop not for the market but for his own consumption. The determination was based upon the fact that Federal regulation of the interstate movement of grain was affected by the total national production. The fact that the farmer did not put his crop into the market, but withheld it, had the effect of not purchasing for his needs. That was a sufficient impact upon the interstate movement of the commodity to warrant Federal jurisdiction, the court held.
Taxicabs, particularly those which have a franchise to serve railroad and bus terminals, are an adjunct of interstate travel. Their temporary unavailability would constitute a burden upon interstate rail and bus travel. It is not mere speculation to foresee that an effective taxi .strike against Wags and the Terminal System could lead to curtailment of train and bus service. Only last year a tugboat strike in New York City caused the diversion of some trans-Atlantic liners to other ports, including Canadian ones. This took place despite the demonstrated ability of captains to moor ships such as The Queen Mary without tugs. Industry or commerce need not be dealt a paralyzing blow before it can be deemed to be burdened by a labor dispute affecting such commerce. As a practical matter, curtailment or elimination of such taxi service would have a substantial effect upon interstate commerce. A labor dispute could very well have a greater impact upon transportation service to interstate passengers than a conspiracy to exclude competition. Wags operation has a sufficient impact upon interstate commerce to justify the N. L. R. B. in asserting jurisdiction over its operation. That it would do so is clear from the Cambridge case (101 N. L. R. B. 1328, supra).
There is nothing in this record to show that any attempt was made by the labor union to invoke the jurisdiction of the National Board in 1948, and it is no answer to say that in certain cases the National Board refused to entertain jurisdiction. In order to maintain its position effectively, it was. the duty of the union first to apply to the National Board. It cannot be predicted what the outcome would have been if the union had made such *810 a resort. In 'any event, as shall presently be demonstrated, whether the National Board would entertain or would refuse to entertain jurisdiction in 1948, the union was not permitted under the Taft-Hartley Act to invoke the jurisdiction of the State Board and that board had no right to assume jurisdiction. Matter of Labor Relations Bd. v. Charman Service Corp. (201 Misc. 291, affd. 281 App. Div. 860) and National Labor Relations Bd. v. New York State Labor Relations Bd. (106 F. Supp. 749) are not here determinative. If anything, they indicate that respondent’s activities here affect interstate commerce.
We have concluded that the respondent’s activities constitute a clear burden on interstate commerce. We have also determined that the N. L. R. B. would today assume jurisdiction in a situation paralleling the instant case. There remains for determination the following issue: In 1948, when the wrongs complained of took place, did N. L. R. B. have the power, in the light of the Taft-Hartley Act, to decline jurisdiction, and if it did not possess that power, did the State Labor Relations Board have the power to act in the face of the refusal of the N. L. R. B, to act, assuming that it would not have acted if the instant case were brought to its jurisdiction?
Compelling authority answers these questions in the negative. (La Crosse Tel. Corp. v. Wisconsin Bd., 336 U. S. 18; Bethlehem Co. v. State Bd., 330 U. S. 767.) The national law intended to preclude State boards from extending their facilities to firms over which the National Board has jurisdiction, even where it has failed to exercise such jurisdiction. Where the field of labor relations is occupied by the Federal Act, the State may not furrow. Accordingly it follows that Federal jurisdiction is not dependent upon whether the N. L. R. B. acts or declines to act in the premises.
In the instant case there is no question but that the rights of employees alleged to have been violated under the provisions of the State Labor Relations Act were also protected under the Labor Management Relations Act. This is not a situation in which the State has laid hold of a separable or distinct segment of a matter not covered by or in conflict with the Federal statute. Such type of situation was illustrated by the case of Algoma Plywood Co. v. Wisconsin Bd. (336 U. S. 301), where the Supreme Court of the United States upheld the jurisdiction of the Wisconsin board to prosecute an unfair practice charge against a firm clearly engaged in interstate commerce. The charge in that case, however, was under a portion of a State statute which was found not to conflict with the national Act, and which covered a subject not covered by the national Act, viz., a requirement that *811 a two-thirds vote is needed to authorize a maintenance of membership agreement.
The Pennsylvania Supreme Court emphasized this fact in Pennsylvania Labor Relations Bd. v. Frank (362 Pa. 537) wherein it construed the Algoma case (supra) to apply only where a State law covered all matter not governed by the Federal law, and held that the case does not apply where a State statute paralleled the national Act.
Where, as here, a State Act paralleled the national Act, any action on the part of the National Board or a refusal to act for budgetary or other reasons would not affect the exclusive nature of the National Board’s jurisdiction. In Pittsburgh Rys. Co., etc., Employees’ Case (357 Pa. 379), where the highest court of the Commonwealth of Pennsylvania, the Supreme Court, denied enforcement of a State labor board order directed to employers over whom the board was without jurisdiction, it was stated (p. 386): “ The clear implication of the decision of the Supreme Court of the United States in Bethlehem Steel Co. et al. v. New York State Labor Relations Board, supra [330 U. S. 767],. is that wherever the employer-employee relationship is one over which Congress has the power of regulation and with regard to which Congress has acted, state power is suspended and cannot constitutionally be exercised * * * The criterion to determine validity of the exercise of state power is not whether the agency administering federal law has acted upon the relationship in a given case; rather, it is whether Congress has asserted its power to regulate that relationship.”
The basic flaw in petitioner’s contention that it can act where the National Labor Board has refused to act is that it ignores the significance of the 1947 amendment to the cession provisions of the Labor Management Relations Act, 1947.
Subdivision (a) of section 10 of the Taft-Haritley Act (U. S. Code, tit. 29, § 160, subd. [a]) provides: “ The Board, is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 8) affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: Provided, That the Board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry (other than mining, manufacturing, communications, and transportation except where predominantly local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by *812 such agency is inconsistent with the corresponding provision of this Act or has received a construction inconsistent therewith.” (Emphasis supplied.)
It is urged upon the court that subdivision (a) of section 10 should not be interpreted so as to permit a wilderness in which neither the National Board nor a State board exercises jurisdiction.
Subdivision (a) of section 10 of the Wagner Act (49 U. S. Stat. 453) vested “exclusive” jurisdiction in the National Board to prevent any of the unfair labor practices the law defined. The word “ exclusive ” was omitted from the Act as amended in 1947 because Title III of the Taft-Hartley Act (§ 301 et seq.; U. S. Code, it. 29, § 185 et seq.) provided for private damage actions for breach of collective bargaining agreements and violation of the so-called secondary boycott sections of the new law.
It has been held that the exclusive nature of the National Board’s jurisdiction was not otherwise affected. (Amazon Cotton Mill Co. v. Textile Workers Union, 167 F. 2d 183 [C. C. A. 4th, 1948].) (The pertinent passage of the Conference Report on the Taft-Hartley Act [House Rept. 510, 80th Cong., 1st Sess.] is set forth in Amazon Cotton Mill Co. v. Textile Workers Union, 167 F. 2d 183, 187, supra.)
The proviso was added to the section by the Taft-Hartley amendments of 1947. Under the pre-existing Wagner Act, the National Board entered into agreements with local boards ceding jurisdiction over certain classes of cases in various fields otherwise subject to the Federal Act.
This sensible accommodation was not challenged. Such a compact between the N. L. R. B. and the New York Board was in force for about two years before the Taft-Hartley amendments became effective. (Text and pertinent memoranda appear in the Appendix to Bethlehem Co. v. State Bd., 330 U. S. 767, 784-796 [1947], supra.) That arrangement did not explicitly cover taxicab operations, but did include (p. 788): “ 5. Small and clearly local public utilities, (This includes local traction companies, as well as gas- and electric light corporations.) ”
In its extensive revision of the Wagner Act (upon which the New York Act, one of the so-called “ Little Wagner Acts ” was patterned) Congress changed some of the substantive definitions of what constitutes “ unfair labor practices ” by employers (§ 8, subd. [a], pars. [1] — [5]), and added a completely new catalogue of union unfair labor practices (§ 8, subd. [b], pars. [1]-[6]). Moreover, it created conditions upon which the N.L.R.B.’s *813 facilities would be available to union petitioners and complainants. They were the filing of non-Communist affidavits and certain periodic reports. The State Act has not been changed to conform. Other sections of the Federal law which govern the determination of unfair labor practice cases were added in 1947. Chief among these were the so-called free speech sections 8 (subd. [c]) and 10 (subd. [e]) governing the nature of evidence required to sustain a finding of violation. These also are not to be found in the State Act.
In adopting the proviso to section 10 (subd. [a]) the clear policy of Congress was to prevent the application of State law and procedure which did not conform to the Taft-Hartley Act. Congress was not unaware of the earlier practice of ceding jurisdiction to local boards. Indeed, it considered the method desirable. But limitations were placed upon such cession. Apparently Congress decided that it was more important to have no cession than to have it without compliance with the standards it prescribed. A secondary purpose may well have been to encourage State legislation to adopt the Taft-Hartley provisions.
There have been no cession agreements concluded with the New York Board or any other. Criticism of the proviso to section 10 (subd. [a]) has come from all quarters including Senator Taft who proposed its partial relaxation in 1949. No such amendments have been adopted, although Congress did amend section8 (subd. [a], par. [3]) and section 9 (subd. [e]) pertaining to union security authorization referenda in 1951. (Public Law 189, 82d Congress, 1st Session; 65 U. S. Stat. 601.)
The proviso bears further examination. The passage contained in parenthesis, prohibited cession in certain classes of eases including “ transportation except where predominantly local in character ”. A reasonable interpretation of this not very clear language is that cession could not be made by the National Board in the transportation industry, but that cession was permissible in that industry if the segment were “ predominantly local in character”.
It has been held by the Supreme Court of the United States and Courts of Appeals in cases too numerous to catalogue that the Labor Management Relations Act represented the full exercise of Congressional authority to regulate interstate commerce and activities affecting interstate commerce. The law has been applied many times with court approval to small operations with only indirect and quantitatively small effect upon interstate commerce. This jurisdictional aspect of the Wagner Act was well litigated before Congress adopted the 1947 amend *814 ments, which made no change whatsoever in the definitions of “ commerce ” and or “ affecting commerce.” (§ 2, snbds. [6], [7].)
It follows quite logically that Congress provided in section 10 (subd. [a]) 'the sole means for transferring to State jurisdiction activities which are subject to the Labor Management Relations Act, as amended.
Thus the National Board has rightly decided that by virtue of the 1947 'amendment it is without power to cede jurisdiction even over an essentially local business where the State statute does not impose the same requirements on unions seeking relief as does the National Act. (Matter of Kaiser-Frazer Parts Corp., 80 N. L. R. B. 1050; Matter of Adams Motors, 80 N. L. R. B. 1518.)
The State Board contends that this case comes within one of the classes defined in the Bethlehem case (330 U. S. 767, supra) under which Federal agency inaction permits State jurisdiction.
In that case the State Board accepted jurisdiction of a representation case for a unit of supervisors of a company whose operations eoncededly came within the scope of the national Act at a time when the National Board refused as a matter of policy to certify union representatives for supervisors. The Supreme Court in that controversy rejected the State Board’s contention that it had “ concurrent ” jurisdiction with the National Board until the Federal agency acted upon the particular case.
The court laid down the following formula for the distribution of Federal and State agency jurisdiction (pp. 773-775):
"When Congress has outlined its policy in rather general and inclusive terms and delegated determination of their specific application to an administrative tribunal, the mere fact of delegation of power to deal with the general matter, without agency action, might preclude any state action if it is clear that Congress has intended no regulation except its own. Oregon-Washington Co. v. Washington, 270 U. S. 87. In other cases, Congress has passed statutes which initiate regulation of certain activities, but where effective regulation must wait upon the issuance of rules by an administrative body. In the interval before those rules are established, this Court has usually held that the police power of the state may be exercised. Northwestern Bell Telephone Co. v. Nebraska State Commission, 297 U. S. 471; Welch Co. v. New Hampshire, 306 U. S. 79. But when federal administration has made comprehensive regulations effectively governing the subject matter of the statute, the Court has said that a state regulation in the field of the statute is invalid even though that particular phase of the subject has not been taken up by the federal agency. Napier *815 v. Atlantic Coast Line R. Co., 272 U. S. 605. However, when federal administrative regulation has been slight under a statute which potentially allows minute and multitudinous regulation of its subject, cf. Atlantic Coast Line R. Co. v. Georgia, 234 U. S. 280, or even where extensive regulations have been made, if the measure in question relates to what may be considered a separable or distinct segment of the matter covered by the federal statute and the federal agency has not acted on that segment, the case will be treated in a manner similar to cases in which the effectiveness of federal supervision awaits federal administrative regulation, Northwestern Bell Telephone Co. v. Nebraska State Commission, supra; Welch Co. v. New Hampshire, supra. The states are in those cases permitted to use their police power in the interval. Terminal Bailroad Assn. v. Brotherhood of Bailroad Trainmen, 318 U. S. 1. However, the conclusion must be otherwise where failure of the federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute. Napier v. Atlantic Coast Line, 272 U. S. 605; compare Oregon-Washington Co. v. Washington, 270 U. S. 87 with Parker v. Brown, 317 U. S. 341; cf. Mintz v. Baldwin, 289 U. S. 346.
It is clear that the failure of the National Labor Relations Board to entertain foremen’s petitions was of the latter class. There was no administrative concession that the nature of these appellants’ business put their employees beyond reach of federal authority. The Board several times entertained similar proceedings by other employees whose right, rested on the same words of Congress. Neither did the National Board ever deny its own jurisdiction over petitions because they were by foremen. Soss Manufacturing Co., 56 N. L. R. B. 348. It made clear that its refusal to designate foremen’s bargaining units was a determination and an exercise of its discretion to determine that such units were not appropriate for bargaining purposes. Maryland Drydock Co., 49 N. L. R. B. 733. We cannot, therefore, deal with this as a case where federal power has been delegated but lies dormant and unexercised.”
It is important that since the Bethlehem decision (330 U. S. 767, supra) Congress enacted the proviso to section 10 (subd. [a]) which prescribes the exclusive means for transferring the jurisdiction of the National Board to a State agency.
This case involves a company subject to the national Act and board. The substantive unfair labor practices are the same under the Federal and State Acts.
*816 It only remains to decide whether the restrictive proviso on cession comes within the general rule stated in the Bethlehem case {supra) that State action is precluded “if it is clear that Congress has intended no regulation except its own ’ ’ (p. 773). _
_ Subdivision (a) of section 10 does prohibit cession except on specified terms. The fact that there are limited exceptions does not vitiate the power of Congress to prevent State action. Indeed, the proviso withdrew from the National Board the authority it had exercised prior to 1947 to cede jurisdiction on its own terms.
The respondent correctly argues, in effect, that the National Board cannot do by abdication what it cannot do by agreement.
The State Board argues that the National Board’s discretionary declination of jurisdiction is not a policy decision of the kind involved in the Bethlehem case (supra). It points to the following observation in the decision of that case (p. 776)': “ The election of the National Board to decline jurisdiction in certain types of cases, for budgetary or other reasons presents a different problem which we do not now decide.”
In 1950, two years after this case arose, the National Board codified its jurisdictional criteria which result in its actual exercise of less than its full jurisdictional power. This self-limitation has been sustained against challenge. (Haleston Drug Stores v. National Labor Relations Bd., 187 F. 2d 418 [1951], cert, denied 342 U. S. 815.) Budgetary considerations were undoubtedly a factor. Petitioner argues that the alleged policy of declining jurisdiction before 1950 has the same basis. However, the National Board’s criteria did not automatically exclude the taxicab industry. The Cambridge case (101 N. L. R. B. 1328, supra) makes it clear that as to taxi companies with exclusive franchises and substantial operations under them, the National Board will accept jurisdiction over a company such as Wags.
Moreover, it does not seem reasonable that the exercise of discretion based upon what the National Board feels is budgetary poverty can make it richer in the power to cede.
In the Bethlehem case (330 U. S. 767, supra) also the Supreme Court rejected the State Board’s theory that there is concurrent Federal and State jurisdiction over enterprises whose operations “ affect ” interstate commerce. It also rejected the contention that such concurrent authority lasts until the National Board deals with the labor relations, or a segment of it, of a particular employer.
*817 The answer that the National Board would take jurisdiction became known in 1952 in the Cambridge case (supra) well before the 1953 State Board final decision in this case. The State Board did not follow the doctrine of that case. Its argument then is reduced to a contention of concurrent jurisdiction unless the National Board exercises its authority over the same or a similar employer prior to — not the State Board’s decision but — the institution of the State Board proceeding.
One further aspect of the Bethlehem case (supra) is pertinent. At the time the State Board acted upon the petition for a unit of foremen, the National Board refused as a matter of policy to do so in other cases. But, the N. L. R. B. reversed its policy prior to the Supreme Court’s decision in the Bethlehem case (supra) and the court sustained the N. L. R. B.’s new policy. (Packard Co. v. Labor Bd., 330 U. S. 485 [1947].) The court said in Bethlehem (330 U. S. 767, 771, supra): “ Whatever constitutional issue may have been presented by earlier phasis of the evolution of the federal policy in relation to that of the State, the question now is ivhether, Congress having undertaken to deal with the relationship between these companies and their foremen, the State is prevented from doing so.” (Emphasis supplied.)
The court held that Congress, through its agent the N. L. R. B., had dealt with the subject matter to the exclusion of state action.
The State Board argues further that the National Board would not (Matter of Almeida Bus Lines, 99 N. L. R. B. 498; Matter of Screw Mach. Prods. Co., 94 N. L. R. B. 1609; Matter of Yellow Cab Co. of California, 93 N. L. R. B. 766), and cannot apply its jurisdictional criteria retroactively. (National Labor Relations Bd. v. Guy F. Atkinson Co., 195 F. 2d 141 [C. C. A. 9th, 1952].)
In the Yellow Cab case (supra) the board held, as a matter of discretion, that it would not reopen its dismissal as a result of its reversal of policy to assert jurisdiction over certain taxicab operations. It may be pertinent to note that the board’s original decisions in Skyview (90 N. L. R. B. 1895, supra) and Yellow Cab (90 N. L. R. B. 1884, supra) were issued the same day. A petition for reconsideration was made in the Skyview case (supra) and the reversal of policy was announced in the second decision in that proceeding (92 N. L. R. B. 1664, supra). No petition for reconsideration was made in the Yellow Cab case (supra) until after the second Skyview decision (supra).
However, the board has held that it will not reopen final decisions or apply new jurisdictional criteria to cases if an *818 employer or union took action in reliance upon earlier jurisdictional policies.
In the Atkinson case (195 F. 2d 141, supra) the board did challenge a closed shop arrangement in the construction industry where the employer and union proceeded upon the assumption that the closed shop ban of Taft-Hartley would not be applied to them because prior to 1947 the board had refused to exercise jurisdiction in that industry. No State law was involved.
The Court of Appeals in that case refused enforcement of that part of its order which sought to redress the past violations. Its holding was based upon the court’s determination that to do so would be an abuse of discretion. However, the court said it would ratify those parts of the order which had future effect. In the particular case this was not done because of intervening special circumstances.
Such an order could only be issued upon the finding that unfair labor practices had taken place. (Taft-Hartley Act, § 10, subd. [c].) It follows that the board may not have power to order back pay and reinstatement based upon discriminatory hiring practices occurring at a time when such action is taken in reliance upon the board’s policy of declining jurisdiction. But, a prospective order based upon such unfair labor practices would be valid. The State Board’s argument on this phase of the case is persuasive, but if there is no remedy, the fault lies with the Congress.
The State Board urges also that the Taft-Hartley six-month Statute of Limitations upon unfair labor practice charges precludes action upon the unfair labor practices involved in this case. Subdivision [b] of section 10 provides in part: ‘ no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board”. [U. S. Code, tit. 29, § 160, subd. (b).]
This contention is not fully developed in the briefs. The import of this argument is that relief for the particular unfair labor practices found by the State Board is unavailable from the National Board.
It should be observed that at the time the charge was filed with the State Board (September 22, 1948) the six months had not run on the discharges which took place on June 19,1948.
To that extent the National Board’s processes were available, and the State Board’s argument that it provided the sole forum in 1948 is baseless.
This argument may be directed to a proposition that once a Federal agency is precluded from action by a Statute of Limitations its jurisdiction lapses. It is sufficient to point out that the *819 six-month provision was designed to rectify what it considered an abuse of prosecuting stale claims. Any proceedings upon occurrences which constitute an unfair labor practice under the Federal Act after the statute runs is a defeat of the Federal policy.
In sum, the nonretroactivity and Statute of Limitation arguments are equitable arguments with considerable appeal. The parallel sections of the national and State law have the same purposes, as far as they go. There is no certainty that relief would have been available under the Taft-Hartley Act considering its different filing provisions and rule of proof. (In letters submitted after oral argument the parties discussed the problem that the assertion of State jurisdiction might permit circumvention of the non-Communist affidavit provisions of the TaftHartley Act [§ 9, subd. (h)]. Petitioner cites cases to demonstrate that the charging union was in fact in compliance [citations]. That is a matter for administrative determination by the National Board. Moreover, the cases only show that Local 259’s parent international was in compliance. The local would also have to be in compliance before the N. L. B. B. could have proceeded with its charge.)
At best, in the light of section 10 (subd. [a]), these are equitable arguments. They cannot confer jurisdiction upon the State agency if under the supremacy clause of the Constitution and an operative Federal statute it is ousted of jurisdiction.
It is held that section 10 (subd. [a]) does preclude State action because Congress has clearly indicated its intention to occupy the field to the exclusion of the States except upon certain defined conditions. Those conditions have not been met in this case.
The basic constitutional policy underlying pre-emption was stated early in our history. In Houston v. Moore (5 Wheat. 1 [18 U. S. 1,1820]), the Supreme Court dealt with this argument (p. 24): “that in cases where the State governments have a concurrent power of legislation with the national government, they may legislate upon any subject on which Congress has acted, provided the two laws are not in terms, or in their operation, contradictory and repugnant to each other. ”
As the court then saw it, if the Federal law and the State law (p. 23) — •“ correspond in every respect, then the latter is idle and inoperative; if they differ, they must, in the nature of things, oppose each other, so far as they do differ. If the one imposes a certain punishment for a certain offense, the presumption is, that this was deemed sufficient, and, under all circumstances, the only proper one. If the other legislature *820 impose a different punishment, in kind or degree, I am at a loss to conceive how they can both consist harmoniously together.”
In 1949, the Supreme Court followed the Bethlehem case (330 U. S. 767, supra) in LaCrosse Tel. Corp. v. Wisconsin Bd. (336 U. S. 18, supra). This case held that the earlier result was not changed by passage of the Taft-Hartley Act and reemphasized the earlier doctrine, observing (p. 26): “ The problem of employee representation is a sensitive and delicate one in industrial relations. The uncertainty as to which board is master and how long it will remain such can be as disruptive of peace between various industrial factions as actual competition between two boards for supremacy.”
What the State Board proposes is that this court ratify its jurisdiction as to past occurrences. It is silent as to the future. The competition between Federal and State boards in this industry is amply demonstrated by the litigation which has already taken place. Indeed, in the Charman case (201 Misc. 291, affd. 281 App. Div. 860, supra) the State Board proceeded with its attempts to secure enforcement of its order even after the N. L. B. B. issued its order based upon the same occurrences.
While it is desirable to have past wrongs rectified, it is more desirable to provide a sound and stable basis upon which this respondent, its employees and any union which may have dealings with them can proceed in the future.
The State Board’s power to determine the equity of granting relief is not a matter committed to its discretion because of its expertise. (Semble Atkinson, 195 F. 2d 141, supra.)
The very recent ease of Garner v. Teamsters Union (346 U. S. 485) casts an interesting reflection on this case. There a labor union peacefully picketed the loading platform of an interstate trucking company for the purpose of inducing the employees of the company to join the union. No labor dispute was in progress and at no time had the company objected to its employees joining the union. A Pennsylvania equity court enjoined the union’s conduct as in violation of the State Labor Belations Act. The Pennsylvania Supreme Court reversed on the ground that the employer’s grievance fell within the jurisdiction of the National Labor Belations Board. The Supreme Court of the United States concurred. Basically it held that where an employer’s operations are subject to the national Act and the situation complained of is generally within the scope of both Federal and similar State law, the latter must give way. Its holding is not as extensive as in the Bethlehem case (330 U. ,S. 767, supra), but its dictum as to the enjoining of picketing is definitely beyond that case.
*821 As it applies to Wags, it merely enforces the general rule of Bethlehem, (supra). For example, the court says in Garner v. Teamsters Union (346 U. S. 485, 488-489, supra): “ This is not an instance of injurious conduct which the National Labor Eelations Board is without express power to prevent and which therefore either is ‘ governable by the State or it is entirely ungoverned.’ * * * It is not necessary or appropriate for us to surmise how the National Labor Eelations Board might have decided this controversy had petitioners presented it to that body. * * * The question then is whether the State, through its courts, may adjudge the same controversy and extend its own form of relief.”
Interestingly enough, the court equates differences in procedure with differences in substantive provisions as a reason for not permitting the State to act. “ [Multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law.” (Garner v. Teamsters Union, 346 U. S. 485, 490-491, supra.)
And in Garner {supra) the court says (p. 501): “ Of course, Congress, in enacting such legislation as we have here, can save alternative or supplemental state remedies by express terms, or by some clear implication, if it sees fit.”
Our Federal system has operated well despite the occasional doubts and conflict about the outer limits of State and Federal jurisdiction. The uncertainty and contests occur in the fringe areas where the Federal and local governments each have legitimate and important interests and authority. The authority of each is best defined by agreement which takes into account the proper subjects and degree of authority to be exercised by each agency in the area of overlap. Courts can only decide such issues as a matter of law without, in cases such as this, the power to exercise judgment so as to make accommodation to fit the needs of private parties and government policies.
The court does not mean to imply that Federal jurisdiction in this industry or part of it is undesirable. It does mean that an issue such as the one presented should not have arisen. It might not have arisen had the two agencies been free to negotiate and make clear which board had the responsibility for specific parts or of all of this industry. But the problem of ceding Federal jurisdiction is only within the power of Congress to resolve. The unavailability of any relief in this particular case appears to be the result of a consciously adopted Congressional policy. The court can do no more than apply the law as it exists.
Petitioner’s application is denied.